CLEARED BY CSO FOR PUBLIC FILING

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ISSAM HAMID ALI BIN ALI AL JAYFI,** *et al.,* )<br><br>)<br><br>) | |
| **Petitioners/Plaintiffs,** ) | **Case No. 1:05-CV-02104 (RBW)** |
| ) | |
| **v.** ) | |
| ) | |
| **GEORGE W. BUSH,** *et. al.,* ) | |
| ) | |
| ) | |
| **Respondents/Defendants.** ) | |

**PETITIONERS' OPPOSITION TO RESPONDENTS' MOTION FOR LEAVE TO**
**EXAMINE PETITIONERS' ATTORNEY-CLIENT PRIVILEGED MATERIALS**

Petitioners Issam Hamid Ali Bin Ali Al Jayfi, Othman Ali Mohammed Al Shamrany, Khalid Mohammed Al Thabbi, Ali Hamza Ahmed Suliman Bahlool, Saleh Mohammed Seleh Al Thabbii, and Abdu Al Qader Ahmed Hussain ("Petitioners"), together with their respective Next Friends as co-Petitioners, by and through undersigned counsel, respectfully submit this opposition to Respondents' motion for leave to review Petitioners' attorney-client privileged materials, which Respondents seized without notice to the Petitioners or the Court almost two months ago. For the reasons that follow, Respondents' motion should be denied, and the Court should enter an order granting Petitioners the relief detailed in Section IV below.

## I.    OVERVIEW

Unquestionably, the three deaths at Guantánamo on June 10 are a serious matter, and a full investigation of the circumstances of those deaths is essential. But the need for this investigation does not justify Respondents' flagrant violation of the Protective Order, nor should the Court grant Respondents' request for retroactive ratification of that breach. Moreover, Respondents have not even attempted to make the particularized showing required to support their request for leave to invade the attorney-client privilege of *any* of these Petitioners, nor have they cited a single case authorizing them to review *all* attorney-client materials belonging to *every* detainee in Guantánamo. Respondents' motion therefore should be denied. In lieu of authorizing the establishment of a so-called "filter team" or granting Respondents' other requested relief, the Court should adopt Petitioners' proposed procedures described in Section IV below. This proposal is designed to protect these attorney-client materials from further intrusion by Respondents, while allowing Respondents another opportunity to seek access to the attorney-client materials of any Petitioner for whom they can make the requisite particularized showing.

## II.    BACKGROUND

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay were found dead in their cells.[1]  According to the declarations of Navy Rear Admiral Harry B. Harris ("Harris Decl.") and Special Agent Carol Kisthardt ("Kisthardt Decl.") filed in support of Respondents' motion, shortly after the discovery of these deaths, the Commander of the Joint Task Force-Guantánamo requested an investigation by the Naval Criminal Investigative Service ("NCIS") to establish the cause and manner of the deaths.  The NCIS has since commenced an investigation.

Almost a month after the NCIS investigation began, Respondents disclosed to Petitioners and the Court *for the first time* that, between June 10 and June 18, 2006, the NCIS seized 1100 pounds of written materials belonging to Guantánamo detainees, and reviewed some of this material.[2]  On July 7, 2006, Respondents filed this motion seeking modification of the procedures governing attorney-client communications in all Guantánamo *habeas* actions, *inter alia,* to permit a government "filter team" to read all mail between the Petitioners and their attorneys.  Respondents purported to base this request for the wholesale review of all detainees' privileged material on the ground that one or more of the detainees who died on June 10 allegedly had used paper supplied by counsel to communicate with other detainees.  Respondents do not dispute that they did not notify Petitioners, or seek leave of the Court, prior to seizing or reviewing the privileged materials at issue.

---

[1]     U.S. Southern Command News Release, *Three Detainee Deaths at Guantánamo Bay*, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/SSOUTHCOM%20 PRESREL% 20 Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc.

[2]     Kisthardt Decl. ¶¶ 2-5.

### III.  ARGUMENT

#### A.  Respondents' Motion Should Be Denied Based On This Court's Recent Reaffirmation of the Broad Stay of Guantánamo *Habeas* Actions

By Order dated January 11, 2006, this Court issued a broad stay of "all action" in this case pending the District of Columbia Circuit's resolution of whether the so-called "Detainee Treatment Act" eliminated federal court jurisdiction over *habeas* actions by Guantánamo Bay detainees.[3]  Since then, the Court has reaffirmed this stay in response to motions in other Guantánamo *habeas* cases pending before it.[4]  Under these circumstances, Petitioners adopt the argument by the *Almurbati* Petitioners that, in light of the stay, this Court should decline to assert jurisdiction over Respondents' request for a modification of the protective orders and other extraordinary relief.[5]  As further developed in that submission, however, this Court retains jurisdiction to enforce the existing protective order, including by adopting Petitioners' proposed procedure for remedying Respondents' breach of the protective order and protecting Petitioners' privileged materials.[6]

#### B.  Respondents' Seizure And Review of Petitioners' Privileged Materials Was Unlawful

The Court has ruled that detainees at Guantánamo have a right to counsel.  Moreover, the Court entered the Protective Order in this action, *inter alia*, to ensure the confidentiality of attorney-client privileged communications between detainees and their counsel and to ensure that detainees have access to such attorney-client materials.  Here, in seizing the privileged materials

---

[3]  *Al Jayfi v. Bush*, Civ. No. 1:05-CV-02104 (D.D.C. Jan. 11, 2006)

[4]  *See, e.g., Almurbati v. Bush*, 04-1227 (D.D.C. June 26, 2006)(order denying request to reinstate motion.)

[5]  *See* Petitioners' Opposition to Respondents' Motion for Procedures Related To Review Of Certain Detainee Materials, dated August 4, 2006, in *Almurbati v. Bush*, 04-1227.

[6]  *See Id.*

at issue without seeking the detainees' consent or leave of court, Respondents have committed precisely the sort of interference with the detainees' communications with their lawyers that the Protective Order was designed to avoid. The Court should not ratify Respondents' violations of court orders authorizing Respondents to retain and/or further review attorney-client materials.

### 1. Respondents Have Violated The Protective Order

Having recognized that detainees — who have not been charged or tried, and who seek the opportunity through counsel to challenge their detention — have a right to counsel and to communicate confidentially with that counsel, this Court held that Respondents are "not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[7]   In part, to prevent this sort of government interference in the detainees' relationships with counsel, the Court issued the Protective Order.[8]

The Protective Order guarantees confidential communication between detainees and their attorneys through rules for in-person meetings and written correspondence. Indeed, it is a given under the Protective Order that attorney-client communications are privileged and confidential. For example, the Protective Order provides that "the presence of the Court Security Officer . . . shall not operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections []" and that "[s]upplying protected information to another party does not waive privilege."[9]   Further, the Protective Order sets forth that the materials

---

[7]     *Al Odah v. United States*, 346 F. Supp. 2d 1, 5 (D.D.C. 2004).

[8]     *See Almurbati et al. v. Bush et al.*, 04-1227 (D.D.C June 26, 2006) (order denying application to reinstate motion) (explaining that this Court has entered the Protective Order to allow petitioners to "have access to their attorneys.").

[9]     *Protective Order of November 8, 2004, at 8 and 12.*.

counsel can provide to clients include "privileged documents."[10]  Finally, the Protective Order

establishes that detainees are entitled to have access to their attorney-client materials.

Respondents' conduct here clearly violated the Protective Order.  *First*, without any

individualized analysis of necessity, the government seized all of Petitioners' (and virtually

every represented detainee's) attorney-client materials, and has since withheld these materials

from Petitioners for nearly two months.  On a recent brief trip to Guantánamo, Counsel visited

two of the Petitioners.  Having been deprived of their correspondence, all other Petitioners have

been without communication from counsel (except to the extent letters recently sent by counsel

have been delivered to Petitioners), and these two Petitioners' only contact has been their

brief/recent visit with Counsel.

*Second*, Respondents admit that they have reviewed attorney-client privileged materials,

including, perhaps, those of Petitioners.[11]  In the Motion, Respondents state that after collecting

all detainee materials, NCIS investigators "separate[ed] privileged information from non-

privileged . . . ."[12]  Such a determination would necessarily  require the review of "privileged

information" if only to allow it to be "separated" from non-privileged information.

Furthermore, Respondents write that NCIS investigators "*scanned*" certain seized documents.[13]

Respondents go out of their way to emphasize that during this scanning, the investigators did not

"*read* the contents" of any documents.[14]   Of course, by "scanning" the documents, NCIS

investigators were able to "see" that the relevant documents had particular words on them; if one

---

[10]     *In re Guantanamo*, 344 F. Supp. 2d 174, 184 (D.D.C. 2004).

[11]     The government does not identify the detainees whose materials were reviewed.

[12]     Resp. Mot. at 7.

[13]     *Id.* (emphasis added).

[14]     *Id.* (emphasis added).

"sees" words on a document, one has "read" at least a portion of the documents. For each of these reasons, there can be no dispute that Respondents have violated the Protective Order, and Petitioners are entitled to relief to remedy this violation.

### 2. *Respondents Have Violated The Attorney-Client Privilege*

Respondents' seizure and review of attorney-client materials also violates what is "the oldest of the privileges for confidential communications known to the common law."[15]  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[16]  As the Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[17]

Nowhere is the effectuation of the privilege more important than for a person who is incarcerated, but has not been tried. For such individuals, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[18]  Moreover, the Supreme Court has held that even for persons

---

[15]     *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[16]     *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *see also, Lanza v. New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[17]     *Al Odah*, 346 F. Supp. 2d at 10.

[18]     *Bach v. Illinois*, 504 F.2d 1100, 1102 (7th Cir. 1974); *see also, Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

convicted of crimes, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[19]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with a prisoner's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[20]

Moreover, in order to invade the privilege — *e.g.,* in the context of an investigation such as this—the government must make a specific, *individualized* showing that there is a compelling justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies — *i.e.,* that a particular client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[21] Similarly, when the government seizes materials from a location that likely

---

[19]     *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

[20]     *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); *Carter v. Hutto*, 781 F.2d 1028, 1031–32 (4th Cir. 1986) (plaintiff alleged a valid claim of denial of access to courts when he alleged that his legal materials were confiscated or destroyed); *see also Simmons v. Dickhaut*, 804 F.2d 182, 183–84 (1st Cir. 1986) ("Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials or papers."); *Hiney v. Wilson*, 520 F.2d 589, 591 (2d Cir. 1975) (alleged confiscation of legal papers would have denied plaintiff access to the courts); *Wright v. Newsome*, 795 F.2d 964, 968  (11th Cir. 1986) ("The allegation that prison officials seized [the plaintiff's] pleadings and law book and destroyed other legal papers clearly states a claim of denial of access to the courts.").

[21]     *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997); *see also, Doe v. United States*, 82 Fed. Appx. 250 (2d Cir. 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

contains privileged papers, that seizure must be supported by probable cause and a warrant, and the government still must employ appropriate means of screening out privileged materials.[22]

The government has not cited a single case even suggesting that attorney-client communications may be seized and reviewed *without* an individualized and substantiated showing that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[23] Even when such documents will be reviewed *in camera* by the court, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that . . . *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[24]

Significantly, virtually all of the arguments Respondents offer in the Motion to justify their invasion of Petitioners' privilege — *ex post* — already were made and rejected by the court in *Al Odah*. There, Respondents sought to justify the abrogation of the attorney-client privilege (in order to inspect attorney notes of counsel's conversations with detainees) on the grounds that: (1) national security concerns justified intervention by the government; (2) detainees might manipulate the privileged communications system in order to pass sensitive information to outsiders; and (3) the mere possibility that communications might be used for intelligence or criminal investigation purposes would not undermine the privilege, as long as such information was not used in connection with the underlying *habeas* legal proceedings.[25] The court rejected

---

[22]    *See, e.g., United States v. Stewart*, No. CR 396 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[23]    *See, e.g., United States v. Grant*, No. 04 CR 207, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause"); *United States v. Skeddle*, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant").

[24]    *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal quotations and citation omitted).

[25]    *See Al Odah*, 346 F. Supp. 2d at 9-10 and n. 12.

all of these arguments because they were "both thinly supported and fail[] to fully consider the nature of the attorney-client privilege."[26] So too here.

Ultimately, Respondents' vague assertions about documents allegedly found in a handful of cells do not establish a "legitimate penological interest" in seizing *all* legal documents from *all* detainees in *all* cell blocks in *all* camps at Guantánamo. Moreover, Respondents have made no individualized showing at all with respect to Petitioners. Respondents have not asserted, let alone demonstrated, for example, that *these* Petitioners were in close proximity to the detainees who died. Respondents have not suggested that *these* Petitioners provided their legal papers to other detainees. Respondents have not suggested that *these* Petitioners have abused the attorney-client privilege in any way. In fact, there is no mention at all of *these* Petitioners in Respondents' motion. Therefore, there can be no disputing that Respondents have not offered even a vaguely colorable argument to justify the seizure, retention, and review of Petitioners' legal papers, whether such review has already occurred or would occur in the future.

### 3. The Purported Factual Basis for Respondents' Motion Is Irrelevant to Petitioners

Respondents have offered no individualized evidence that any Petitioner misused his legal papers, in connection with these deaths, or otherwise. Moreover, the documents Respondents describe as evidence of "wrongdoing" by some other detainees fail to support their argument — as to any detainee — that attorney-client materials have been misused.

*First*, the document labeled "FOUO" is not a classified document. "FOUO" or "For Official Use Only" labels are *not* classification designations and are not recognized by the Protective Order. "FOUO" is simply an internal Department of Defense designation, used to

---

[26]    *Id.* at 10.

identify whether a particular document may be released to the public pursuant to the Freedom of Information Act. "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the public under [FOIA] . . . ."[27] The designation is specifically "not authorized as an anemic form of classification to protect national security interests"[28] and in fact "is, by definition, unclassified."[29] The Protective Order does not prevent detainees from being in possession of FOUO documents, which, by definition, represent no security risks, and there is therefore no reason why a detainee may not legitimately be in possession of such documents.

 *Second*, the document bearing a crossed-out "SECRET" stamp may well not be a classified document. (Respondents have not provided counsel with copies of the documents they rely upon in the Motion, so counsel can only make an educated guess about the nature of this document.) Based on counsel's experience in these cases, it seems quite likely that the document was *once* classified and that the document later was declassified and marked accordingly. It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it. The Protective Order does not prevent detainees at Guantánamo from possessing unclassified documents and, therefore, there is no reason why a detainee could not legitimately be in possession of such documents. If Respondents are suggesting that the document may be a classified document that some *habeas* counsel smuggled out of the secure facility, doctored, and then sent to a client, the government has offered no factual predicate for this suggestion. Certainly counsel for these Petitioners have never taken such steps.

---

[27] DoD Regulation 5200.1: C5.2.7.1.1.3 (emphasis added).

[28] *Id.* 5400.7-R: C4.1.1.

[29] *Id.* AP3.2.2.3.2.

Third, the "knot-tying" document is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a detainee's privileged legal folder. (Again, counsel have not seen the document and have no way to know even if Respondents' characterization of this document is accurate.) The document therefore appears to have no relevance to the Motion, which seeks further review only of privileged items that have been confiscated by government agents.

*Fourth*, a supposed suicide note handwritten on the back of a piece of paper stamped "attorney-client privileged" was quite obviously not being "hidden."[30] The piece of paper was allegedly discovered in the mesh of the cell of one of the dead detainees, not secreted away in a folder of privileged documents. If the deceased were seeking to keep this document from guards by disguising it as a privileged document, he likely would not have placed it in a location where it would be readily discovered. As a point of fact, while undersigned counsel has provided paper bearing the firm's name for purpose of writing letters and taking notes during meetings, we have never provided Petitioners with blank notepaper stamped "attorney-client privileged" or with any similar phrase.

*Finally*, Respondents do identify a single document that — from the government's description — likely should not have been in the possession of a detainee. Remarkably, however, the document is an email from JTF-Guantánamo itself — a document that obviously was not provided to a detainee by counsel, considering that counsel do not have access to such documents.

In sum, Respondents violated the Protective Order and the most sacred of privileges by seizing, retaining, and reviewing attorney-client materials. Nearly a month after this violation,

---

[30]    Resp. Mot. at 5.

Respondents sought ratification of their actions and permission to continue this course of conduct. Fatal to this request, however, Respondents fail to offer any justification as to why Petitioners' legal papers have been seized and retained, or should be reviewed, and fail to demonstrate that the attorney-client privilege has been abused by any detainee or his counsel.

### C.     ANY FURTHER REVIEW OF PETITIONERS' LEGAL PAPERS SHOULD BE CONDUCTED BY THE COURT OR A SPECIAL MASTER

If further review of Petitioners' legal papers is allowed, the use of a Department of Defense "Filter Team" is inappropriate. As Respondents appear to recognize in their Motion, courts are reluctant to entrust attorney-client privileged materials to such governmental teams.[31] In fact, "the use of government taint teams has often been questioned or outright rejected by the courts,"[32] including quite recently by the U.S. Court of Appeals for the District of Columbia in a case that concerned a Filter Team nearly identical to that proposed here.

On July 28, 2006, the Court of Appeals rejected a plan that had been approved by the District Court for the creation of a Justice Department Filter Team to review potentially privileged documents that had been seized during a criminal investigation of Congressman William J. Jefferson.[33] The government's proposal to utilize a Filter Team to review Petitioners' attorney-client materials is not materially distinguishable from that repudiated by the Court of Appeals.

---

[31]     *See* Resp. Mot. at 21, n.12.

[32]     *In re Search of the Scranton Hous. Auth.*, No. 04-MISC Nos. 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006); *see, e.g., Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing Special Master rather than filter team to review potentially privileged documents obtained by search warrant).

[33]     *United States v. Rayburn House Office Bldg., Room No. 2113*, No. 06-3105, slip op. at 1–2 (D.C. Cir. July 28, 2006) (Ex. B hereto).

On May 18, 2006, the government filed an application for a warrant to search Congressman Jefferson's office for documents and computer files related to an alleged bribery scheme. The warrant application "set forth a set of 'special search procedures' to be used in an effort to 'minimize the likelihood that any potentially politically sensitive, non-responsive items' would be disclosed," and also to "prevent investigators and members of the Prosecution Team from obtaining documents or files 'that may fall within the purview of the Speech of Debate clause … or any other pertinent privilege.'"[34] The government proposed, and the District Court authorized, the use of a Filter Team to determine "first whether each document was responsive, and second whether it fell within the purview" of any pertinent privilege.[35] Non-responsive documents were to be returned to Congressman Jefferson, while potentially privileged documents were to be copied, logged, provided to the Congressman's counsel, and submitted to the District Court for a final determination of privilege.[36] Copies of documents that the Filter Team alone determined were responsive and unprivileged were to be provided directly to prosecutors.[37] These procedures, of course, are nearly identical to those proposed in this Motion.

In response to an emergency motion for stay pending appeal, the Court of Appeals rejected this scheme. The Court remanded the matter to the District Court with instructions that the government was not to be involved in any review process. The District Court was ordered to have a judicial officer or Special Master provide copies of all documents to Congressman Jefferson, after which the Congressman was to submit to the District Court *ex parte* any claims

---

[34]    *In re Search of the Rayburn Office Bldg., Room No. 2113*, No. 06-0231 M-01, slip op. at 3 (D.D.C. July 10, 2006) (Ex. C hereto).

[35]    *Id.*

[36]    *Id.* at 3–4.

[37]    *Id.* at 4.

that specific documents were privileged.[38]  The District Court, in turn, was to review the Congressman's claims of privilege *in camera*.[39]  Finally, the government was "enjoined from reviewing any documents or records seized from Congressman Jefferson's office" pending further order of the Court of Appeals.[40]  In light of this authority, Respondents' request here should be rejected.

Also, quite recently, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[41]  Further, "at least three [of the] courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[42]

In this context and especially considering the government's professed desire to "exploit the 'intelligence value'" of monitored attorney-client communications,[43] "it is important that the procedure adopted in this case not only be fair but also appear to be fair."[44]  Yet "[i]t is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding the honor of [those involved]."[45]  Here, "there

---

[38]    *See United States v. Rayburn House*, slip op. at 1.

[39]    *Id.*

[40]    *Id.*

[41]    *See In re Grand Jury Subpoenas 04-124-03 and 04-124-05*, Nos. 05-2274/2275, slip op. at 6 (6th Cir. July 13, 2006), *available at* http://www.ca6.uscourts.gov/opinions.pdf/06a0245p-06.pdf.

[42]    *United States v. Stewart*, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

[43]    *Al Odah*, 346 F. Supp. 2d at 10 n.11.

[44]    *Stewart*, 2002 WL 1300059, at *6.

[45]    *In re Search Warrant for Law Offices*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994).

is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[46]

Concerns about the appearance of propriety are especially important here, given the difficulties that counsel has experienced in gaining and keeping the trust of Guantánamo detainees generally.  Before meeting with counsel in the aftermath of the Supreme Court's decision in *Rasul*, the detainees had "been detained virtually incommunicado for nearly three years without being charged with any crime."[47]  Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system."[48]  Considering that the notion of attorney-client privilege is foreign to many detainees, questions as to whether this privilege has any meaning would only intensify if detainees were to learn that their attorney-client materials were being reviewed by lawyers for the military that detains and (in certain cases) interrogates them.

Another unacceptable aspect of Respondents' proposal is the suggestion that the Filter Team should be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, in addition to determining whether or not the documents are relevant to the NCIS investigation.[49]  The Respondents posit that if the filter team determines that certain documents are not privileged, such documents will be "returned . . . to JTF-Guantánamo for appropriate action."[50]  It is not for a Filter Team to evaluate privilege claims.  Such a review for privilege leaves "the government's fox . . . in charge of the [clients']

---

[46]    *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[47]    *Al Odah*, 346 F. Supp. 2d at 12.

[48]    *Id.*

[49]    *Id.* at 11.

[50]    *Id.*

henhouse," with no check against the possibility that the Filter Team would draw "false negative conclusions," overriding legitimate claims of privilege.[51]

Respondents' motion also appears designed to chill attorney-client communications. In the Motion, Respondents suggest that "others" — *i.e.*, non-detainees — may have participated in a "manifest abuse of the legal mail system."[52] This assertion is offered without credible support and would appear to be a veiled threat to *habeas* counsel, intended to deter them from communicating freely with their clients. Indeed, buried in a footnote is the government's assertion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[53]

Habeas counsel with access to classified information have security clearances and are aware that they work under the shadow of possible contempt and criminal actions. Indeed, the fact that counsel has been granted clearance precludes the government from arguing in broad generalities that counsel cannot be trusted with classified information or otherwise.[54] As such, it is not for the government to decide what communications are "directly related" to counsel's representation of its clients.

## IV. CONCLUSION AND RELIEF REQUESTED

For the reasons discussed herein, Respondents' Motion should be denied. To the extent that Respondents have credible support for an argument that any particular Petitioner's

---

[51]    *In re Grand Jury Subpoenas*, slip op. at 10.

[52]    Resp. Mot. at 10.

[53]    Resp. Mot. 11 n.10.

[54]    *Al Odah,* 346 F. Supp. 2d at 14.

privileged material must be reviewed as part of the NCIS investigation, Respondents should be required to make that showing on an individual, particularized basis.  In the event the Court concludes that Respondents have made that showing as to a particular detainee, consistent with the Court of Appeals' analysis in the Jefferson case, the Court should appoint a Special Master to review the privileged materials in lieu of permitting a representative of the government to do so. All other Petitioners' privileged materials should be returned to them forthwith.

Accordingly, Petitioners respectfully request that the Court issue an Order adopting the following procedures for resolving this Motion and protecting Petitioners' attorney-client privilege:

(1)    Pending resolution of this motion as to each Petitioner, Respondents are directed to transfer by secure means all impounded materials belonging to Petitioners to the Court Security Officer at the Secure Facility designated under the Protective Order;

(2)    Respondents must determine, with respect to each individual Petitioner, whether they contend there are sufficient, particularized grounds for continued impoundment and review of that Petitioner's seized attorney-client materials; and, to the extent Respondents contend such particularized grounds exist, within ten days of the Court's Order, Respondents must file a supplemental memorandum and supporting affidavit purporting to demonstrate such grounds with respect to that Petitioner.  A Petitioner's response to any such supplemental memorandum and affidavit shall be due within ten days of service, except as otherwise directed by the Court. To the extent a Petitioner's response requires his counsel to visit Petitioner at the base, the Court will hear requests for adjournments of the response deadline on that basis;

(3)    To the extent Respondents file no supplemental memorandum or affidavit with respect to a Petitioner, Respondents' motion shall be denied with prejudice as to that Petitioner.

In that event, counsel for Petitioner shall review Petitioner's impounded materials at the secure facility and arrange for the immediate return of all attorney-client material to Petitioner through the procedures for Legal Mail set forth in the Protective Order;

(4)    If, based upon any supplemental affidavit and memorandum, and the response thereto, the Court determines that Respondents have sufficiently demonstrated a need to review a Petitioner's seized attorney-client materials as part of the NCIS investigation, a Special Master or other third party appointed by the Court will review such seized material in accordance with further instructions from the Court; and

(5)    Upon completion of this review by the Special Master and upon further order by the Court, counsel for each Petitioner subject to the motion shall review Petitioner's seized materials and arrange for the immediate return of all attorney-client material to Petitioner (except to the extent certain materials are retained pursuant to further orders from the Court) through the procedures for Legal Mail set forth in the Protective Order.

Respectfully submitted,
Counsel for Petitioners:

Wesley R. Powell
wpowell@hunton.com
Patrick Train-Gutiérrez
ptrain-gutierrez@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166
(212) 309-1000
(212) 309-1100 (facsimile)

Karma B. Brown
kbbrown@hunton.com
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)


*Of Counsel*
Barbara J. Olshansky (NY0057)
Director Counsel
Gitanjali S. Gutierrez (GG1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

August 4, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ISSAM HAMID ALI BIN ALI AL JAYFI,** *et al.,*  )
)
**Petitioners/Plaintiffs,**  )
)   **Case No. 1:05-CV-02104 (RBW)**
**v.**  )
)
**GEORGE W. BUSH,** *et. al.,*  )
)
)
**Respondents/Defendants.**  )
)

### DECLARATION OF SERVICE

Michelle Kass hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am a paralegal at Hunton & Williams LLP, attorneys for Petitioners Issam Hamid Ali Bin Ali Jayfi, et al.

That on August 4, 2006, I served a true copy of Petitioners' Opposition to Respondents' Motion for Leave to Examine Petitioners' Attorney-Client Privileged Materials on all parties via the Court's ECF System, and on all parties who did not receive these court filings via the Court's ECF system, by depositing same in a duly enclosed and sealed wrapper, with the correct postage thereon, in an official letter box duly maintained by the Government of the United States of America within the State of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 4, 2006.

_____
Michelle Kass