IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ISA ALI ABDULLA ALMURBATI, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1227 (RBW) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| TAJ MOHAMMAD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-0879 (RBW) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| ASIM BEN THABIT AL-KHALAQI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-0999 (RBW) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

| | | |
|---|---|---|
| ISSAM HAMID ALI BIN ALI AL JAYFI, *et al.*, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 05-2104 (RBW) |
| GEORGE W. BUSH, President of the United States, *et al.,* | ) ) ) | |
| Respondents. | ) ) | |
| JABBAROV OYBEK JAMOLIVICH, *et al.*, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 05-2112 (RBW) |
| GEORGE W. BUSH, President of the United States, *et al.,* | ) ) ) | |
| Respondents. | ) ) | |
| ABDUL HALEEM, *et al.* | ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 05-2376 (RBW) |
| GEORGE W. BUSH, President of the United States, *et al.,* | ) ) ) | |
| Respondents. | ) ) | |

|  |  |
|---|---|
| AMER MOHAMMON, *et al.*, | ) |
|  | ) |
|  | ) |
| Petitioners, | ) |
|  | ) |
| v. | )    Civil Action No. 05-2386 (RBW) |
|  | ) |
| GEORGE W. BUSH, | ) |
| President of the United States, *et al.,* | ) |
|  | ) |
| Respondents. | ) |

**RESPONDENTS' REPLY MEMORANDUM IN SUPPORT OF JULY 7, 2006 MOTION
FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS
AND OPPOSITION TO PETITIONERS' REQUESTS FOR
<u>RELIEF ASSOCIATED WITH IMPOUNDMENT OF DETAINEE MATERIALS</u>**

Respondents hereby submit in the above-captioned cases this reply in support of their July 7, 2006 Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing ("July 7 Motion") and in opposition to petitioners' requests for various forms of relief associated with the impoundment of materials at issue in the July 7 Motion, including requests for sanctions, return of the impounded materials, and transfer of the materials to the Court or to petitioners' counsel. Because petitioners' filings in opposition to the July 7 Motion are substantially similar, respondents submit this consolidated reply.[1] The substantially similar nature of the filings in this matter also warrant that the Court decide the July 7 Motion in a coordinated, and expedited, fashion among the cases.[2]

---

[1] Petitioners' filings in these cases are similar both to each other and to the filings of petitioners in numerous other cases, some of which petitioners here adopt by reference. *See infra* note 9. Accordingly, the arguments presented in this reply are substantially similar to the reply filed by respondents on July 28, 2006, in a number of Guantanamo cases, but this reply includes the correction of certain information regarding the scope of materials involved in the initial sorting of the impounded materials. *See infra* at 4-7.

[2] Several petitioners' counsel question whether their petitioners have attorney-client materials that have been impounded since counsel have not communicated with the petitioners. *See*, *e.g.*, Haleem Opp. at 1; Jamilovich Opp. at 3-4; Mohammon (El-Fawzan, Mattan) Opp. at 3-4; Mohammon Opp. (dkt. no. 123) at 3-4; Mohammon (Ali) Opp. at 2-3 (In the *Ali* filing, counsel claims respondents prevented her from meeting with petitioner contrary to Court order; respondents deny this and will respond to counsel's claims in a formal response to a separate show cause motion filed in the case (dkt. no. 129).) Respondents are willing to withdraw their July 7, 2006 Motion with respect to petitioners for whom counsel do not believe potentially privileged attorney-client communications would be contained in the impounded materials. However, any actual examination of the impounded documents is currently awaiting the Court's consideration of the July 7 Motion. *See infra* at 6-7. In certain other Guantanamo cases, the Court has directed respondents to indicate petitioners with respect to whom respondents do not believe attorney-client communications occurred prior to June 18, 2006. *See*, *e.g.*, Aug. 7, 2006 Order, *Al Odah v. United States*, No. 02-CV-0828-CKK (dkt. no. 302). Consistent with that directive, and based upon an inventory of the bags of materials pertaining to detainees from whom materials were seized (though not the content of the bags), *see infra* note 6, respondents are attaching Appendices 1 and 2 regarding these cases. Appendix 1 indicates petitioners in

(continued...)

As explained below, the impoundment of detainee materials by the Naval Criminal Investigative Service ("NCIS") was a reasonable and legally appropriate investigatory response to a serious security situation arising within a wartime detention facility, reflected in apparently coordinated detainee action with respect to suicides, attacks on personnel, and misuse of materials reserved for privileged legal communications. Furthermore, the use of a Filter Team, as requested by respondents, to sort clearly unprivileged documents in the detainee materials from attorney-client communications, is warranted and appropriate so as to permit the NCIS investigation to proceed while protecting privileged attorney-client communications from inappropriate disclosure.[3]

---

[2](...continued)
these cases, other than *Mohammon*, from whom no materials were impounded or from whom materials were impounded but who did not – to respondents' knowledge – have written or oral communications with counsel through legal mail channels prior to the impoundment of materials. Appendix 1 also indicates petitioners from whom materials were impounded and who could have had attorney-client communications prior to the impoundment. Appendix 2 provides the same information with respect to petitioners in *Mohammon*. Respondents note that given that the first entry of the Protective Order in *Mohammon* was not until June 27, 2006, after the NCIS impoundment, to respondents' knowledge petitioners in *Mohammon* with impounded materials would have had the opportunity for privileged attorney-client communications only through duplicate cases by petitioners in which the Protective Order had been entered (making legal mail channels available). Such duplicate cases are also indicated in Appendix 2.

With respect to the category of petitioners from whom no materials were impounded, the July 7 Motion may be withdrawn or denied as unnecessary. With respect to the category of petitioners from whom materials were impounded but who did not – to respondents' knowledge – have written or oral communications with counsel through legal mail channels prior to the impoundment, respondents' motion remains pending out of an abundance of caution. Respondents are willing to withdraw their motion or have the motion denied as necessary in such circumstances, but only with the consent of petitioners' counsel or at the direction of the Court.

[3] The July 7 Motion was made without prejudice to respondents' position that the Court lacks jurisdiction in light of the Detainee Treatment Act of 2005, *see* July 7 Motion at 2 n.3, and respondents do not concede the jurisdictional issue. The effect of the Supreme Court's recent decision in *Hamdan* on the jurisdictional issue will be addressed in the pending Guantanamo detainee *habeas* appeals in the Court of Appeals through supplemental briefing to be completed
(continued...)

- 2 -

## ARGUMENT

I.    **THE SEIZURE OF THE IMPOUNDED DETAINEE MATERIALS WAS LEGAL AND APPROPRIATE.**

Petitioners claim that the impoundment of detainee materials by the NCIS as part of its investigation into the circumstances of the recent suicides of three Guantanamo detainees, as well as any broader plot or planning for other such attempts in the past or future, was illegal and nothing more than an attempt to thwart detainees' access to the courts and their relationships with attorneys acting on their behalf. Petitioners' arguments, however, improperly conflate the current, temporary impoundment of the detainee materials (as well as respondents' request for Court authorization of procedures for sorting and review of the materials intended to protect the attorney-client privilege) with actual abrogation of the attorney-client privilege. Furthermore, counsel's arguments improperly attempt to second-guess and denigrate the government's ability to respond to and address serious security concerns arising with respect to the wartime detentions at Guantanamo Bay.

A.    **Abrogation of the Attorney-Client Privilege Has Not Occurred.**

Much of the rhetoric in the various oppositions filed by petitioners to respondents' July 7, 2006 Motion appears to be grounded in the assumption that attorney-client communications in the

---

[3](...continued)
by August 15, 2006.

Some petitioners complain that any prior stay in these cases should preclude consideration of the July 7 Motion. *See*, *e.g.*, Almurbati Opp. at 5-6; Al Jayfi Opp. at 4. Aside from the fact that petitioners at the same time inconsistently complain that the government should have submitted its motion prior to the impoundment and also seek their own relief with respect to the impounded materials, consideration and granting of the July 7 Motion is appropriate where respondents seek Court relief to permit them to address a serious security issue at Guantanamo in a fashion protective of attorney-client privilege, even if any stay must be lifted to do so.

universe of detainee materials that have been impounded have been permanently taken from the detainees and have been and will be reviewed in an unauthorized fashion. This is incorrect.

As explained in respondents' July 7 Motion, on June 10, 2006, three detainees at Guantanamo committed suicide. Just a few weeks prior to that, at least two other detainees had also attempted suicide or self-harm using illicitly hoarded medicine. On the same day as those prior attempts, detainees in Camp 4 communal living bays were able to launch a coordinated ambush attack on guards there. The three successful suicides occurred in separate cells in the same cellblock on the same day and in essentially the same manner. Handwritten, apparent suicide notes were found on the deceased detainees, and a handwritten note was found in one of the deceased detainee's cell that, when translated, proved to be related to the suicides and written by someone other than the detainee who died in the cell in which the note was found. *See* July 7 Motion, Exhibit B (Kisthardt Decl.) ¶ 3. That note was written on notepaper that was stamped on the back as privileged attorney-client material. *Id.* Furthermore, notes were found in a living detainee's cell that, once translated, appeared to have been written by at least two of the deceased detainees on stationery that had been stamped as confidential attorney-client materials, *id.*, even though the deceased detainees had not been contacted by attorneys.

In light of this evidence that the deceased detainees had secreted suicide notes between themselves and at least one other living detainee, the NCIS – which conducts its investigations independently and with which commands with matters under investigation are obligated to cooperate – expanded the scope of its investigation to the cells of other enemy combatant detainees at Guantanamo. Approximately 1,100 pounds of materials were collected by NCIS on or about June

14, 2006, with materials collected from each detainee's cell being separately bagged. *Id.* ¶¶ 4-5. NCIS personnel then began sorting a portion of these materials.

Respondents' July 7 Motion erroneously asserted that this sorting involved "materials from bags pertaining to eleven detainees." *See* July 7 Motion at 7. This representation was not correct, being based on an inadvertent oversight in the declaration supporting the motion, as explained in the attached supplemental declaration of the supervisory NCIS investigator involved in the sorting. *See* Supplemental Declaration of Carol Kisthardt ¶ 4 (attached as Exhibit C) ("Kisthardt Supp. Decl."). In fact, the sorting involved eleven bags that each contained a number of the detainee-specific bags of material,[4] comprising materials collected from approximately 155 detainees, but amounting to only 10%, by weight, of the total 1,100 pounds of impounded material. *Id.* ¶¶ 4-5. As noted in the July 7 Motion, the sorting involved separating any potentially attorney-client information from non-privileged material and conducting a preliminary scan of the non-privileged material for relevancy to the NCIS investigation, Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 5, though not all of the material, even among the nonprivileged, could be comprehended because it was written in languages for which translators were not present during the sorting, *id.* ¶ 5.[5]

---

[4] As explained in the supplemental declaration, materials collected by NCIS from each detainee's cell were separately bagged, and those bags were then marked with detainee identifying information. Kisthardt Supp. Decl. ¶ 3. Those detainee-specific bags were then collected and placed into larger, grocery-style paper bags. *Id.* It is the contents of eleven of these grocery-style bags that were the subject of the sorting process described in the July 7 Motion and above.

[5] Respondents regret the inaccurate description of the amount of material involved in the sorting exercise. The error, however, was inadvertent and does not change the essential nature of the sorting, which did not involve the reading of attorney-client materials, but rather involved the separation of any potential attorney-client material from other, nonprivileged material.

As explained in the July 7 Motion, during this sorting a note was discovered that contained instructions concerning the tying of knots. Kisthardt Decl. ¶ 5. In addition, the sorting uncovered a potentially classified e-mail from a camp officer containing information regarding cell locations of detainees and other details regarding camp operational matters. *Id.* The latter discovery led to the examination of other materials from the same detainee to determine whether there were other potentially classified U.S. Government documents in that detainee's possession, including in three legal mail envelopes. *See id.* An NCIS investigator scanned the contents of the three envelopes, but did not read the documents therein. *See id.*; Kisthardt Supp. Decl. ¶ 5.

The sorting made clear that review and translation of the collected detainee materials would be burdensome given the volume of materials and the apparent multitude of foreign languages involved, and it revealed the likelihood that attorney-client communications would be encountered. *See* Kisthardt Decl. ¶ 5. In addition, as noted in the declarations of the supervisory NCIS investigator in charge of the investigation, the only review of the 1,100 pounds of seized materials was the initial sorting of the subset of the materials described above. *See id.*; Kisthardt Supp. Decl. ¶ 5. Further, attorney-client communications were not read. Any materials appearing during the sorting to be possibly attorney-client in nature were set aside. *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 5. With respect to the detainee among whose materials was found the potentially classified JTF-Guantanamo e-mail, however, the contents of three legal mail envelopes were scanned in the search for other possibly classified U.S. documents. *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 5. While certain markings on documents in the envelopes were observed, the documents in the envelopes were not read. *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 5.

- 6 -

After the initial sorting of the subset of materials, further review of the impounded materials was suspended until appropriate procedures and staffing could be developed to account for the scope of the undertaking, the translation needs, and the possibility that the review team would encounter potentially privileged attorney-client communications.  *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 3.  The bags of materials are currently kept in sealed boxes in a locked and alarmed storage facility consistent with NCIS practices for maintenance of evidence obtained in criminal investigations, *i.e.*, under the control of the NCIS to the exclusion of others, including Guantanamo authorities.  *See* Kisthardt Supp. Decl. ¶ 3.  No further review of the contents of the bags of materials is occurring pending the Court's consideration of respondents' July 7 Motion.[6]  *Id.*

Furthermore, the impoundment of detainee materials did not affect delivery of legal mail to detainees after the impoundment, and scheduled visits by counsel to Guantanamo are continuing.

Accordingly, no "abrogation" of attorney-client communications has occurred.  While the amount of material involved in the initial NCIS sorting was greater, with respect to the number of detainees involved, than reported in the July 7 Motion, the mechanics and nature of the sorting reflects that attorney-client materials have not been read.  In addition, the impoundment by NCIS of attorney-client materials within the impounded materials is temporary, pending authorization of procedures that would permit the effective separation of unprivileged matter from privileged, attorney-client communications.  Furthermore, otherwise appropriate ongoing legal communications between petitioners and their counsel are not being impeded: legal mail is being delivered pursuant

---

[6] As explained in recent conferences with Magistrate Judge Kay on this matter, after the impoundment, NCIS personnel conducted an inventory of the bags of material to determine detainees for whom bags of materials exist.  The inventory, however, was not of the contents of the bags and did not involve review of materials within the bags.

to the applicable Protective Order and counsel visits with petitioners are being scheduled and are ongoing. The attorney-client privilege, therefore, has not been "abrogated" by the impoundment of detainee materials. For the same reasons, the Protective Order has not been violated by the impoundment, and the impoundment was not contrary to *Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004).[7]

    **B.**    **Impoundment of the Detainee Materials and the Request for Court Authorized Procedures for Sorting and Review of the Materials Is Fully Justified**.

        *1.*    *The Impoundment and Request for Review Procedures Is a Reasonable Investigatory Response to a Serious Security Situation at Guantanamo.*

    Despite petitioners' attempts to obfuscate the matter, petitioners' counsel admit, as they must, that it has long been recognized, even in the context of the detention of U.S. individuals possessing constitutional rights, that officials must be permitted to take all reasonable steps to mitigate and address potential threats to the security of detention facilities and the safety of personnel and detainees in those facilities, including with respect to searches of detainee quarters and materials. For example, in *Bell v. Wolfish*, 441 U.S. 520, 555-57 (1979), the Supreme Court upheld against a due process challenge a number of security-related practices, including searches of the cells and persons of those held in pretrial detention facilities. And in *Hudson v. Reno*, 468 U.S. 517 (1984), and *Block v. Rutherford*, 468 U.S. 576 (1984), the Court upheld against constitutional challenge, including Fourth Amendment challenge, even random searches of detainee cells outside of the detainees' presence. *See also Turner v. Safley*, 482 U.S. 78 (1987) (prison practice impinging on

---

    [7] In any event, neither the Protective Order nor the *Al Odah* decision addresses a security-related situation such as that presented here, *i.e.*, where evidence exists of coordination respecting detainee suicides and detainee misuse of attorney-client stationery for unprivileged communications, justifying a response to the situation. *See also infra* § I.B.

prisoner's constitutional right is nonetheless valid if reasonably related to legitimate penological interests); *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997) (applying *Turner* standard to challenge to withholding of inmate legal papers).  As the Supreme Court noted in *Block* with respect to the propriety of searches of detainee cells:

> We . . . cautioned [in *Wolfish*]: Prison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

468 U.S. at 585 (citing *Wolfish*, 441 U.S. at 547).  *See also* 468 U.S. at 591 ("[W]e could not have been clearer in our holding in *Wolfish* that this is a matter lodged in the sound discretion of institutional officials.").  Moreover, the Court stated that "officials are not obligated to adopt the least restrictive means to meet their legitimate objectives."[8]  *Id.* at 591 n.11.

Such deference would be even more appropriate in the context presented in the Guantanamo *habeas* cases here, that is, with respect to actions taken in response to specific security issues raised at a military detention facility during a time of war, including where, as here, the security issues bear the hallmarks of coordinated planning by enemy combatant detainees against their captors.  *See* July 7 Motion at 14.  Indeed, as previously explained, Guantanamo was faced with three concurrent

---

[8] Accordingly, even if petitioners – aliens detained outside of U.S. territory – were permitted to avail themselves of the Fourth Amendment in this context, which they are not, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990) (Fourth Amendment does not "restrain the actions of the Federal Government against aliens outside of the United States territory"), petitioners' citation of *Lonegan v. Hasty*, 2006 WL 1707258 (E.D.N.Y. Jun. 22, 2006), which utilized a Fourth Amendment analysis, *see* Mohammad Opp. at 3; Mohammon (Ali) Opp. at 5, is misplaced.  *Lonegan* did not involve security-related searches of detainee cells, but rather surreptitious recording of attorney-client conversations contrary to regulation and unrelated to security concerns, *see id.* at *4, *15, and, thus, has no application here.  *See Hudson*, 468 U.S. at 526 (Fourth Amendment does not apply to security-related searches within the confines of the prison cell).

suicides in the same cellblock on the same day, in essentially the same manner, and evidence exists that the deceased detainees had secreted suicide notes between themselves and at least one other living detainee and had (mis)used materials for support of the suicides that were on their face reserved for privileged legal communications. The seizure of detainee materials was, at the very least, a reasonable investigatory response to a serious security issue. Further, an initial sorting of a subset of the detainee documents impounded uncovered a note providing instructions concerning the tying of knots, along with a potentially classified e-mail from a camp officer that was somehow obtained by a detainee. Accordingly, the impoundment of the detainee materials, and the request for ultimate review of the materials, for the purpose of comprehending the scope of and mechanisms for detainee planning of suicide attempts at Guantanamo, both in the past and possibly in the future, with the goal of disrupting those mechanisms, is appropriate under any realistic standard. It is most definitely appropriate under the deferential standard established by the Supreme Court in the U.S. prison context and would be especially so under what should be an even more deferential standard given the unique context here involving the detention of individuals held by the military as enemy combatants.

Petitioners' counsel, however, attempt to undermine the basis for the impoundment of the detainee materials, but these attacks are based on improper attempts to second-guess the security factors that led to the impoundment. The scope of petitioners' counsel's willingness to second-guess the bases for the NCIS impoundment of detainee materials is stunning.[9] Counsel offer their opinion

---

[9] Counsel in certain cases, *see* Mohammon Opp. (dkt. 123) at 6-7; Mohammon (Mattan) Opp. at 6-7; Jamilovich Opp. at 3, adopt oppositions to the July 7 Motion filed in other cases, including in *Abdah v. Bush*, No. 04-CV-1254-HHK, which contains a number of outlandish and misleading allegations regarding the NCIS impoundment that exceed even the improper attacks

(continued...)

that the detainee suicides were not related, coordinated acts,[10] even in the face of obvious circumstantial evidence to the contrary, *see supra* at 3-6.  The same counsel go so far as to claim that there is no basis for the NCIS impoundment or, for that matter, its investigation aimed at addressing the serious security issue posed by any coordination of detainee suicides, because, according to counsel, "assisted suicide" cannot be a crime at Guantanamo.  *See* Mohammad Opp. at 2 n.1. Petitioners' counsel also disagree that the use by the suicide victims of attorney-client stationery may reflect an attempt to shield or disguise materials from detection, *see*, *e.g.*, Almurbati Opp. at 14; Al Jayfi Opp. at 12, despite the fact that the deceased detainees had not had contact with attorneys and the materials were positioned so as not to be discovered until after the suicide and upon the search of the detainees' effects.  *See* Kisthardt Decl. ¶¶ 3-4.  Counsel even assert that the investigation of how detainees came into possession of the potentially classified JTF-Guantanamo e-mail should be hamstrung to prevent NCIS from potentially discovering other such materials in the possession of detainees or information in the detainee materials that might shed light on how the e-mail was obtained.  *See* Al-Khalaqi Opp. at 12.

Petitioners' counsel go so far as to speculate, based upon an assumption that the detainees are able to share information among themselves by word of mouth accurately and efficiently, that

---

[9](...continued)
reflected in the oppositions to the July 7 Motion at issue in the cases to which this Reply pertains. Respondents refer the Court to the reply previously filed in *Abdah* for a response to those even more outlandish allegations, and incorporate that response by reference (with corrections to the factual information therein reflected *supra* at 5-7).  *See* Resps' Reply Memo. in Support of July 7, 2006 Mot. for Procedures Related to Review of Certain Detainee Materials And Opposition to Petrs' Requests for Relief Associated with Impoundment of Detainee Materials (*Abdah*, No. 04-CV- 1254-HHK, dkt. no. 182; *Al Odah*, No. 02-CV-0828-CKK, dkt. no. 297).

[10] *See* Mohammad Opp. at 2 (suggesting conditions of confinement caused suicides).

- 11 -

there is no need to examine any detainee writings.  *See* Al-Khalaqi Opp. at 12.  This despite the discovery of multiple writings and other documents described *supra*.

Of course, the law, even in the context of detentions of U.S. individuals possessing constitutional rights as opposed to the alien enemy combatants here, does not permit petitioners' counter-factual opinions and conjectures to carry the day.  Rather, a response to a security issue within a detention facility is entrusted to the reasonable judgments and discretion of responsible officials.  *See supra* at 8-9.  The impoundment of the detainee materials here was a reasonable and appropriate investigatory response to a security situation arising within a wartime detention facility. It was undertaken for purposes of comprehending the existence of and mechanisms for detainee planning of suicide attempts at Guantanamo, both in the past and possibly in the future, with the goal of disrupting those mechanisms and potentially saving lives and otherwise maintaining ongoing security and order within the facility.  *See* Kisthardt Decl.; July 7 Motion, Exhibit A (Harris Decl.) ¶ 4.  The impoundment, therefore, was appropriate.

> **2.    *No Individualized, Detainee-Specific Showings of Probable Cause Are Needed to Justify Impoundment and Review of the Detainee Materials.***

Petitioners argue that the relief respondents request, *i.e.*, the authorization of a Filter Team for sorting and review of the impounded detainee materials in a fashion that protects privileged attorney-client communications from disclosure, requires an individualized showing of probable cause by the government with respect to each detainee for whom material is to be reviewed.  *See*, *e.g.*, Almurbati Opp. at 10-11; Al-Khalaqi Opp. at 8; Mohammad Opp. at 7-8; Al Jayfi Opp. at 8-9. Petitioners reason that just as an individualized showing is necessary to warrant application of the crime-fraud exception so as to deny the protection of the attorney-client privilege to an otherwise

protected attorney-client communication, "[s]imilarly, when the government seizes materials from a location that likely contains privileged papers, the seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials." *See*, *e.g.*, Almurbati Opp. at 10-11; Al Jayfi Opp. at 8-9. This argument, however, conflates the impoundment of the detainee materials and respondents' request for Court authorization of a Filter Team for sorting and review of the materials in a fashion intended to protect the attorney-client privilege, with actual abrogation of the privilege. As discussed *supra*, the Fourth Amendment's probable cause standard and warrant requirement applicable to searches of the property and persons of U.S. citizens has no application to searches and seizures in a prison context, either generally or with respect to specific detainees.[11] Rather, legitimate security interests and concerns fully justify the NCIS impoundment in this wartime detention facility context. As to an "appropriate means of screening out privileged materials," that is exactly the relief respondents are seeking.

Thus, at this point, the issue before the Court is much more simple and straightforward than whether an otherwise protected attorney-client communication may be disclosed as falling within an exception to the privilege. Rather, an impounded set of detainee materials exists that presumably includes detainee communications with persons other than counsel, other detainee papers, as well as, possibly, attorney-client communications, typically within legal mail envelopes.[12] As to the

---

[11] Petitioners' citation of *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002), *see*, *e.g.*, Almurbati Opp. at 11 n.31, is not to the contrary. That case involved a warrant issued for the search of a private law office.

[12] Knowledge of the contents of the bags of impounded materials is based on common sense, as well as the initial investigatory steps taken by NCIS, including its initial sorting of a subset of the impounded material. *See* Kisthardt Decl. ¶¶ 3-5; Kisthardt Supp. Decl. ¶ 5. The remainder of the materials, including the materials in the legal mail envelopes in the sampled

(continued...)

- 13 -

former category – documents that are not attorney-client communications – such documents and writings, without question, are subject to review by NCIS, as well as Guantanamo authorities, without Court authorization. Beyond the indisputably unprivileged materials, however, the universe of impounded documents would also contain legitimate attorney-client communications, typically in legal mail envelopes. Furthermore, given the demonstrated existence of nonprivileged documents masquerading as privileged, *i.e.*, on stationery stamped as attorney-client privileged, it is entirely possible that similar unprivileged writings bearing some trapping of an attorney-client communication exist. Other related possibilities include nonprivileged materials intermingled, *i.e.*, stored, among legitimate attorney-client communications within legal mail envelopes, or nonprivileged notes or messages hand-written on otherwise legitimate attorney-client materials.[13] As with the status of the notes uncovered so far, the status of such materials and information as unprivileged would not necessarily be readily discernable absent translation,[14] which would necessarily involve some review of the material.

Thus, in order to sort unprivileged materials from legitimately privileged attorney-client communications, an inspection and possible translation of the materials to an extent necessary to ascertain their nature, including of material in legal mail envelopes, is necessary. And given the

---

[12](...continued)
material, have not been reviewed. *See supra* at 6-7.

[13] While petitioners argue that no legal mail envelope scanned in the NCIS sampling of detainee materials was found to contain, in counsel's view, improper material, only three such envelopes out of the universe of 1,100 pounds of material were scanned. Given that the detainees were misusing attorney-client materials for unprivileged communications, however, some review of the contents of legal mail envelopes is warranted.

[14] As noted in the NCIS declaration, the impounded documents will include materials in a number of different foreign languages. *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 5.

possibility of encountering attorney-client communications that would be privileged, respondents have proposed that the materials be reviewed and sorted by a Filter Team so that privileged materials are not disclosed to NCIS investigators or Guantanamo authorities.  Thus, contrary to petitioners' unfounded accusations, respondents have been respectful in the extreme of the attorney-client privilege; the privilege has not been abrogated, nor will it be through respondents' proposed Filter Team review.  *See also infra* § II.

Such an arrangement, *i.e.*, the sorting of unprivileged information from legitimate attorney-client communications, as with the impoundment of detainee materials, is not dependent upon a showing of probable cause.  Rather, such sorting is a necessary aspect of any review of detainee materials.  The issue is how to accomplish the review and sorting in a fashion that respects the privilege, and respondents' proposal does just that.  If privileged attorney-client materials are to be returned at all, those materials, in all events, must be identified in and segregated from the universe of impounded materials.

Indeed, one of the cases primarily relied upon by petitioners' counsel makes clear that such sorting is necessary and does not require a showing of probable cause.  In *Goff v. Nix*, 113 F.3d 887 (8th Cir. 1997), the court considered challenges to certain practices of a penitentiary limiting communications between inmates, practices that were alleged to deny inmates the right of access to the courts.  The court applied the standard of *Turner v. Safely*, *see supra* at 8-9, to the penitentiary's practice of refusing to return an inmate's legal documents to him when his jailhouse lawyer was transferred to another facility.[15]  While the court upheld an injunction against the permanent deprivation of the inmate's legal papers represented by the practice, it recognized the state's

_____

[15] The documents either had to remain with the jailhouse lawyer, who could not return them once he was transferred, or they were destroyed.  113 F.3d at 888-89.

legitimate concern that contraband – which was considered in the case to include not only physical contraband, but certain unauthorized communications between or about inmates, *see* 113 F.3d at 891 & n.2 – not be disseminated through the return of putative legal papers that had been in an inmate's possession for some period of time. *Id.* at 892. Accordingly, the court upheld a requirement that prison officials be permitted to scan the documents to be returned so that any contraband could be confiscated.[16] *See id.* Thus, despite the presence of privileged material, the *Goff* court authorized a sorting review by prison officials themselves.

Here, of course, respondents have proposed sorting of the impounded materials not by NCIS investigators or Guantanamo authorities, but by a Filter Team operating under Court-ordered nondisclosure constraints as a safeguard for privileged communications among the impounded materials. An individualized showing of probable cause is simply not required for such Filter Team review. Only where the Filter Team were to encounter an attorney-client communication that was excepted from the privilege, *e.g.*, under the crime-fraud exception, would an individualized showing be required, *i.e.*, to demonstrate the applicability of the exception. Respondents' Filter Team proposal contemplates this, however; the Filter Team is not permitted to disclose attorney-client communications except upon obtaining the permission of counsel or the Court. *See* July 7 Motion,

---

[16] Thus, the proposition that privileged, incoming legal mail in the prison context can be inspected by prison officials for contraband, but not read, does not undermine respondents' request for Filter Team review in this context. Here, the issue is with respect to materials that have rested in the hands of detainees with the potential for detainees to use, abuse, or add to such materials or legal mail envelopes for purposes of creating unprivileged materials or facilitating unprivileged communications. Further, here, the review of the materials will be performed not by the detaining officials themselves, but by a Filter Team operating under Court-ordered nondisclosure constraints.

Proposed Order.  An individualized showing of probable cause, however, is not required for the Court to permit the Filter Team review and sorting of the impounded materials to occur.[17]

## II.    THE FILTER TEAM PROCEDURE PROPOSED BY RESPONDENTS IS APPROPRIATE AND SHOULD BE ORDERED BY THE COURT.

As discussed above, both the impoundment of detainee materials and the anticipated review of such materials is fully justified and appropriate.  The Court also should authorize the procedures for the review proposed by respondents, *i.e.*, the use of a Filter Team composed of individuals essentially walled-off from the *habeas* litigation.  As discussed in the July 7 Motion, the Filter Team will be composed of individuals meeting the qualifications of the Department of Defense "Privilege Team" created by the Protective Order, that is, DoD "attorney[s], intelligence, or law enforcement personnel [or translators] who have not taken part in, and, in the future, will not take part in, any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee."  *See* Access Procedures § II.D.  At present, it is anticipated that the Filter Team will be composed of Navy JAG attorneys assisted by DoD translators as necessary, but, again, only those who have not taken part in and will not take part in litigation and other proceedings pertaining to the detainees.  The Filter Team would review the detainee materials, segregating attorney-client communications from other unprivileged detainee materials.  Unprivileged materials will be

---

[17] Thus, petitioners' assertions that Court authorization was required prior to impoundment of the detainee materials is erroneous.  Similarly, petitioners' attempts to impugn the basis for the impoundment of materials based on the timing of respondents' July 7 Motion must fail.  Respondents filed their motion once the circumstances of the impoundment and the appropriate relief to be sought from the Court were ascertained.  Further, with respect to issues of timing, respondents in their July 7 Motion and otherwise, have attempted at every turn to obtain an expedited resolution of this matter to permit this aspect of the NCIS investigation to move forward and enable the return of privilege attorney-client communications in the detainee materials to detainees.  Petitioners' counsel, however, have resisted expedited and coordinated handling of the matter.

- 17 -

disclosed to NCIS investigators, and documents among those determined not to be relevant to the investigation will be returned to JTF-Guantanamo for return to the detainees or other appropriate action. With respect to attorney-client communications encountered in the Filter Team review, the Filter Team would be prohibited by Court order from disclosure of those documents, absent the consent of counsel or the Court. *See* July 7 Motion, Proposed Order. Given that the object of the Filter Team review is to sort legitimate attorney-client communications from unprivileged documents that may ultimately be relevant to the NCIS investigation, any legitimate attorney-client communications not bearing on the investigation, especially those in English, can be identified quickly and set aside without detailed further review and returned to detainees.[18] Should the Filter Team encounter an attorney-client communication that is excepted from privilege, however, the Filter Team could not disclose the document to NCIS investigators or Guantanamo authorities, but rather would be constrained[19] to seek the consent of the detainee's counsel or authorization from the

---

[18] Materials in foreign languages, especially those that are not typewritten or on law firm letterhead, however, will require some amount of review for translation so as to ascertain that they are attorney-client communications.

[19] As explained in the July 7 Motion, however, the proposed Filter Team procedure permit the Filter Team to disclose information discovered in attorney-client communications that pertains to future events that threaten national security or involve imminent violence, that is, in situations in which the current Access Procedures already contemplate and require disclosure of otherwise confidential information to JTF-Guantanamo. *See* Access Procedures § VII. A., D.-F (DoD Privilege Team permitted to disclose such information discovered during classification review of legal communications); *id.* § IX.C (petitioners' counsel required to disclose such information learned from a detainee).

Court[20] for such disclosure.[21]    Thus, the proposed review of the detainee materials should be straightforward and efficient, with the Filter Team subject to appropriate safeguards imposed by the Court regarding qualifications and nondisclosure of attorney-client communications.

Petitioners' counsel argue that the proposed Filter Team review should be rejected in favor of review by the Court itself or a special master or even counsel.  Counsel's objections to the use of a Filter Team run to the possible perception of unfairness in the use of such a team and to the asserted possibility that the Filter Team would draw "false negative conclusions" about the applicability of privilege to particular documents.  *See*, *e.g.*, Almurbati Opp. at 20; Mohammad Opp. at 12.  These concerns do not warrant rejection of the use of the Filter Team in this matter, however. Here, the Filter Team would be operating under Court-ordered constraints regarding team members' qualifications and duties of nondisclosure, all but eliminating concerns of fairness.  Indeed, similar constraints have been in place and operated successfully with respect to the DoD Privilege Team, created under the Court's Protective Order for classification review of otherwise privileged material, for almost two years without compromise of privileged material.  Further, petitioners' counsel's concern that disagreements over the applicability of privilege will not become apparent until documents are disclosed to NCIS investigators fails to account for the fact that under respondents' requested procedures, the Filter Team is not permitted to disclose any attorney-client communication

---

[20] Because of the prospect that the Filter Team may need to raise disclosure of specific attorney-client communications with the Court, it is necessary that the Court also authorize a Filter Litigation Team to represent the Filter Team in such matters, as discussed in the July 7 Motion.  *See* July 7 Motion at 12, 22-23.

[21] Petitioner Al-Dossari's claim that, given his prior suicide attempts, his attorney-client materials will be disclosed to NCIS investigators, *see* Almurbati Opp. at 19, does not take this factor into account.

without consent or Court authorization. Thus, counsel's argument that the Filter Team will be disclosing such communications based on its own privilege determinations is misplaced.

Furthermore, of the cases cited by petitioners' counsel that criticized the use of "taint teams," none voiced a *per se* rejection of such mechanisms. Rather, some of the cases have involved after-the-fact expressions of preference for court review over taint team review,[22] and, in any event, rulings on the issue have involved a consideration of the various facts and circumstances of the situations involved, including the interests of the parties, the volume and ease of segregation of materials subject to review, and feasibility of court involvement.[23] Indeed, courts have recognized that the use of alternative review procedures in certain circumstances can result in unacceptable delays injurious to the government's interests. For instance, while the court in *Black v. United States*, 172 F.R.D. 511 (S.D. Fla. 1997) ultimately adopted a procedure for court review of the limited materials involved in the matter, it noted with respect to a special master review procedure adopted in *United States v. Abbell*, 939 F. Supp. 860 (S.D. Fla. 1996) (another case cited by petitioners), that one and one-half

---

[22] *See, e.g.*, *In re Search of the Scranton Hous. Auth.*, 2006 WL 1722565 (M.D. Pa. Jun. 22, 2006); *In re Search Warrant for Law Offices*, 153 F.R.D. 55 (S.D.N.Y. 1994); *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997).

[23] *See, e.g.*, *United States v. Grant*, 2004 WL 1171258 at *3 (S.D.N.Y. May 25, 2004) (approving use of filter team and noting that "exceptional set of circumstances," not applicable in *Grant*, led to rejection of use of such a team in *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002); *see also* July 7 Motion at 21 n.12 (discussing special circumstances in *Stewart*).

Also, in *In re Grand Jury Subpoenas*, ___ F.3d ___, 2006 WL 1915386 (6th Cir. Jul. 13, 2006), the court decided against use of government taint team in review of documents subject to grand jury subpoena, where a third party claimed privilege over the documents in the hands of the subpoenaed party. In doing so, it marginalized interests in grand jury secrecy in light of fact that in routine circumstances the party claiming privilege would have received the grand jury subpoena and, thus, known what the grand jury was seeking. The court also relied heavily on the availability of alternate review procedures that would ensure timely review and assessment of the limited number of potentially privileged materials. *See id.* at *11-*12.

years after adoption of procedure, and two and one-half years after the initial seizure of documents, the review process still was not completed. 172 F.R.D. at 514 n.4. The court observed, "A special master review procedure utilized in *United States v. Abbell* . . . takes too long and costs too much. It would effectively deprive the Government of any access to the seized information."[24] *Id.* at 516.

Here, the facts and circumstances augur decidedly in favor of the Filter Team review procedure requested in respondents' July 7 Motion. First, the situation involved here is unique. The review at issue is a key aspect of an investigation in response to specific security issues raised at a military detention facility during a time of war, where the security issues bear the hallmarks of coordinated planning by detainees against their captors. The context is one in which government interests are entitled to wide-ranging deference, *see supra* at 8-9, and the purpose of the investigation, of which the review is part, is to fully uncover the complete circumstances of the suicides, including the extent to which coordination among and assistance from other detainees or others existed, as well as any other plans for additional detainee suicides or other violence. The strong public policy interests in potentially saving lives and in maintaining security and order within a wartime detention facility warrants the prompt and efficient separation of unprivileged materials from attorney-client communications that can be accomplished through the requested Filter Team procedures.

---

[24] One factor that apparently motivated the *Abbell* court to establish the procedure it did was that "vast portions of the materials seized relate[d] . . . to clients of the law firm [subjected to the search] who have no relationship to the matter under investigation or to the scope of any probable cause which may have been demonstrated." *See United States v. Skeddle*, 989 F. Supp. 890, 896 (N.D. Ohio 1997). Similar factors motivated rejection of taint team review in *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002), *see* July 7 Motion at 21 n.12, but are not involved here where authorities are investigating matters related to the security of Guantanamo.

- 21 -

Second, the volume of materials to be reviewed in this matter is massive, some 1,100 pounds worth.  Furthermore, documents in those materials will be in a variety of languages, reflecting the various nationalities of the Guantanamo detainees; thus, significant translator resources will be required in the review to make determinations as to the nature of foreign language documents, so they can be sorted between attorney-client communications and unprivileged materials appropriately.  In such circumstances, review by a Filter Team with government translator resources appears to be the only option for prompt review of the materials.  Any more cumbersome or time-consuming procedure very well could engender protracted delays such as those experienced in *Abbell*, and such delays would be wholly unacceptable in this context.

Third, as discussed above, issues of fairness and integrity of the Filter Team are addressed through the Court-ordered constraints regarding the qualifications of team members and their duties of nondisclosure.

Fourth, concerns over "false negative conclusions" as to applicability of privilege are misplaced in view of the fact that the Filter Team will be parsing attorney-client communications from other materials and will not be disclosing attorney-client communications it determines to be unprivileged on its own, without counsel's consent or Court authorization.  (In a related vein, to the extent counsel would seek a process in which any disclosure of any document by the Filter Team, even if not an attorney-client communication, must be preapproved, such a process would not be appropriate.  Given the volume of documents, the scores of cases and attorneys involved, and the presumed need for complete translation of documents to facilitate an approval process, the sheer

- 22 -

logistics of preapproval would effectively frustrate the entire review process and "deprive the Government of any access to the seized information." *Black*, 172 F.R.D. at 516.)[25]

The recent order of the D.C. Circuit on a motion to stay pending appeal in *United States v. Rayburn House Office Building, Room 2113*, No. 06-3105 (D.C. Cir. Jul. 28, 2006), does not undermine the request for Filter Team review of the impounded materials in these cases. The *Rayburn House Office Building* case involved documents seized from the office of a United States Congressman pursuant to a search warrant as part of a bribery investigation. The United States proposed to examine the documents using a government filter team, but the Congressman contended that the documents had been unlawfully seized and that the Speech or Debate Clause precluded review of them by anyone until the Congressman was permitted to segregate documents he viewed as privileged. The District Court rejected the Congressman's arguments. *See In re Search of*

---

[25] The same would be true with respect to petitioners' proposals that each detainee's documents, whether attorney-client communications or not, be separately provided to counsel for review and production of a privilege log.

Similarly, the unique circumstances involved in this matter warrant rejection of the requests of petitioners' counsel that pending resolution of the July 7 Motion, the impounded materials be transported from Guantanamo to the registry of the Court in Washington, D.C. Aside from the fact that the volume of materials is significant, presenting issues regarding transportation of the materials the more than 1,300 miles from Guantanamo to D.C. and regarding appropriate storage of the materials, there is simply no need for transfer of the materials to the Court. As previously noted, the materials are currently kept in sealed boxes in a locked and alarmed storage facility consistent with NCIS practices for maintenance of evidence obtained in criminal investigations, *i.e.*, under the control of the NCIS to the exclusion of others, including Guantanamo authorities. Further, the materials are not being review pending resolution of the July 7 Motion. *See* Kisthardt Decl. ¶ 5; Kisthardt Supp. Decl. ¶ 3. In addition, transfer of the materials to the registry of the Court is inappropriate given that many, if not most, of the materials are likely not attorney-client communications and, thus, are not properly the subject of deposit into the Court's registry. For these reasons, the Court should reject the requests for deposit of the impounded detainee materials with the Court.

*Rayburn House Office Building Room Number 2113*, 432 F. Supp. 100, 119 (D.D.C 2006), *stayed pending appeal*.

The Congressman appealed, and sought a stay pending appeal.  In the order relied upon by petitioners, the Court of Appeals temporarily stayed the filter team procedure, and remanded the record for the District Court to determine what "legislative" documents, if any, had been seized pursuant to the search warrant.  *See Rayburn House Office Building,* No. 06-3105, slip op. at 1 (remanding for findings "regarding whether the specific documents or records [seized] are legislative in nature"); *id.* at 2 (District Court to notify Court of Appeals "promptly upon its determination of the question on remand").  The Court of Appeals directed that a judicial officer or special master conduct the necessary review of the seized documents, *id.* at 1, but the Court of Appeals in its brief order did not hold or even suggest that government filter review of materials that include potentially privileged documents is impermissible.  Rather, it simply elected to utilize a different procedure in the context of a remand of the record to obtain information it apparently wished to have before ruling more definitively in the appeal.  The Court of Appeals' choice of procedure in that setting did not establish any rule of law concerning the use of government filter teams to review potentially privileged material.

In any event, the *Rayburn House Office Building* case involved features that firmly distinguish it from the NCIS impoundment here.  First, the privilege assertedly applicable to the seized materials in *Rayburn House Office Building* is constitutional in nature, arising directly under the Speech or Debate Clause.  Furthermore, the volume and nature of materials involved was such that the special master review process conceivably could be conducted in an expedited and manageable fashion.  *See id.* at 1 (ordering congressman to respond with claims that documents are legislative in nature within two days of receiving at set of copies of the seized materials).

- 24 -

As explained above, however, the volume of the NCIS-impounded materials at issue here is massive, multiple languages are involved, and the need for review is to fully comprehend matters directly pertaining to maintenance of safety and security within a wartime detention facility.  Indeed, the differences between the cases further undermine any argument that the Court of Appeals order in *Rayburn House Office Building* compels rejection of the use of a Filter Team in the unique situation presented by the NCIS impoundment.

In sum, in contrast to the circumstances involved in many of the cases critical of the use of filter teams, the unique circumstances involved in this matter, and the contemplated Court-ordered safeguards in use of the Filter Team provided for in respondents' proposal – safeguards imposed in order to protect attorney-client privilege – all call for Court authorization of Filter Team review.

## <u>CONCLUSION</u>

For the foregoing reasons and those stated in respondents' July 7 Motion, the July 7 Motion should be granted, and the requests of petitioners' counsel for various forms of relief associated with impoundment of detainee materials should be denied.


Dated: August 11, 2006                    Respectfully submitted,

                                          PETER D. KEISLER
                                          Assistant Attorney General

                                          DOUGLAS N. LETTER
                                          Terrorism Litigation Counsel

_/s/ Terry M. Henry_
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
MARC A. PEREZ
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents