UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET~~

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ABDUL QADER AHMED HUSSEIN, | ) | Filed with Classified Information Security Officer |
|  | ) | CISO _____ |
| Petitioner, | ) | Date _____ |
|  | ) |  |
| v. | ) | Civil Action No. 05-2104 (RBW) |
|  | ) |  |
| BARACK H. OBAMA, | ) |  |
| President of the United States, et al., | ) |  |
|  | ) |  |
| Respondents. | ) |  |

### MEMORANDUM OPINION

Currently before the Court is Abdul Qader Ahmed Hussein's (ISN 690)[1] petition for a writ of habeas corpus, in which he argues that he should be released from the United States detention facility in Guantanamo Bay, Cuba because his detention is not statutorily authorized under the Authorization for the Use of Military Force (the "AUMF"), Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001). Petition for Writ of Habeas Corpus ("Pet.") ¶ 3. The government opposes the petitioner's habeas petition on the grounds that, among other things, he "traveled to Afghanistan to join al-Qaida, the Taliban, []or associated forces," thereby rendering him detainable under the AUMF. Joint Pre-Trial Statement ("Joint Stmt.") at 1. After carefully considering the evidence presented by both parties and the arguments of counsel during the merits hearing that commenced on May 25, 2010, and concluded on September 1, 2010, as well as the various documents that have been filed by the parties in this matter and the exhibits

---

[1] "ISN" is the acronym for "Internment Serial Number." Al-Harbi v. Obama, Civil Action No. 05-2479 (HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010). Each of the detainees currently housed at Guantanamo Bay has been assigned an ISN. Id.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

attached to these filings,[2] the Court concludes for the following reasons that the petitioner's

petition for a writ of habeas corpus must be denied.

## I.    Background[3]

The petitioner is "a native of Al-Mukullah, Yemen." Joint Stmt. at 2, 12. Around the

time when he was finishing his "last year in middle school," id. at 14:14, when he was

approximately fourteen-years old, id. at 19:22, the petitioner contends he desired to leave Yemen

and travel to Pakistan, see id. at 14:22-24 (testimony by the petitioner that he "traveled to

Pakistan" after he "got the results" of his final exams in September 1999 and "knew [he had]

passed"), because (1) he wanted "to learn and memorize the Koran," 5/26/10 Hr'g Tr. at 16:7, (2)

he wanted "to learn about . . . computers," id. at 16:8, and (3) he wanted "to get involved in some

rescue activities," such as "helping the Afghani poor people," id. at 16:9-10. Of those three

reasons, the petitioner's "main goal was to memorize the Holy Koran," 5/26/10 Hr'g Tr. at

27:11-12, because, according to the petitioner, "memorizing the Koran is something that is

highly appreciated[;] . . . it teaches you to have a good moral character," and "[i]t teaches you to

treat people well," id. at 27:20-23. Furthermore, the petitioner reasoned that because he did not

"speak the Pakistani language, . . . [he would] have . . . a lot of time . . . to learn the Koran." Id.

at 17:14-15. With regard to his alleged desire to assist poor Afghanis, the petitioner states that

his interest in such charitable work stemmed from his childhood experience, when he "used to

---

[2] In addition to the evidence and arguments presented by the parties at the merits hearing, the Court considered the following documents in reaching its decision: (1) the government's Factual Return; (2) the petitioner's Traverse; and (3) the parties' Joint Pre-Trial Statement ("Joint Stmt.").

[3] This section provides a summary of the petitioner's admissions that were submitted to the Court through his testimony at the merits hearing, the undisputed facts set forth in the parties' Joint Pre-Trial Statement, and his two declarations, which were designated as Exhibits 200 and 201 in the Petitioner's Exhibits Binder. As discussed below, however, the Court does not credit all of these admissions and, in fact, believes that many of these admissions constitute "false exculpatory statements" that will be weighed against the petitioner. See infra at 18.

2

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

help [his] father . . . work [at a] charity organization" and assist "Somali refugees" by "distributing food[ and] clothes" to those individuals. Id. at 16:15-22. As to his interest in computers, the petitioner viewed Pakistan as a place to pursue his studies because it "was a very cheap country and[,] . . . from [a] technological point of view, it[ is] more advanced than Yemen." Id. at 17:10-12.

Despite his interest in traveling to Pakistan, the petitioner did not conduct any research about the country. Id. at 18:3-4. According to the petitioner, the travel habits of individuals in the Middle East differ from those of Americans; specifically, the petitioner claims that unlike "the culture . . . in America," where people "plan . . . what they are going to do" prior to traveling, the petitioner asserts that people from "Yemen and [other] Arab countries" do not engage in such planning; rather, they simply "take enough money to [travel]," and they bring with them any necessary phone numbers and identification. Id. at 18:7-17. And, while the petitioner had interest in being involved with charitable projects in Pakistan, he did not conduct any research on any organizations; rather, he contends he planned to locate "humanitarian . . . or human rights organizations" that assisted Afghani refugees once he arrived in Pakistan. Id. at 18:22-25. The petitioner did discuss his travel plans with his father, who "accepted" and "welcomed" the idea of the petitioner traveling to Pakistan. Id. at 17:18-23. Thus, "[i]n [September] 1999," id. at 14:6-8, the "[p]etitioner traveled from Sana'a, Yemen to Karachi, Pakistan," Joint Stmt. at 12. The petitioner's father "paid for the trip," 5/26/10 Hr'g Tr. at 17:17, and thereafter provided the petitioner with money while he was living in Pakistan, Pet'r's Exhibits, Ex. 200 (First Declaration of Ahmed Abdul Qader Hussein ("First Pet'r's Decl.")) ¶ 4.

Upon arriving in Karachi, the petitioner decided "to do some sightseeing." Id. at 24:25-25:1. He testified he spent two weeks in Karachi, id. at 23:21-22, before deciding to travel to

3

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

Quetta, id. at 25:2-3, where he understood that a charity devoted to assisting Afghani refugees

was located, id. at 26:21-22. He then took a group bus from Karachi to Quetta, id. at 26:24,

where he "liv[ed] in the Jama'at [a]l-Tabligh[i] mosque" for the three-month period he was

living in Quetta, Pet'r's Exhibits, Ex. 200 (First Declaration of Abdul Ahmed Qader Hussein

("First Pet'r's Decl.")) ¶ 17, 5/26/10 Hr'g Tr. at 27:2-3; see also 5/26/10 Hr'g Tr. at 27:5

(testimony by the petitioner that he stayed at "a mosque known by the name of the Tablighi").

        While in Quetta, the petitioner asserts that he wanted to learn about "how [he] could join .

. . a charity organization."[4] Id. at 29:6-7. The petitioner would ask questions of "people that

would come into the mosque," id. at 29:17-18, about "ways to start working and helping Afghani

refugees," id. at 29:6-7. From those conversations, he learned that the standard of living "in

Afghanistan . . . was much cheaper than Pakistan." Id. at 29:9-10. Thus, the petitioner was told

that "if [he] wanted to help Afghani refugees, . . . it would be much better" to provide such

assistance in Afghanistan.[5] Id. at 29:11-13.

        One of the individuals he spoke with about his desire to assist Afghani refugees was an

individual by the name of Sayed Khan, see Joint Stmt. at 12 ("Before crossing the [Pakistani-

Afghani] border, [the p]etitioner met a man named Sayed Khan."); but see 5/26/10 Hr'g Tr. at

29:25-30:2 (testimony by the petitioner that he traveled to Afghanistan with "Mr. Khan," but did

---

[4] The petitioner testified at the merits hearing that when he "got to" Pakistan, he "said to [him]self" that because he was "very young at that point, . . . nobody [would] hire [him] to work." 5/26/10 Hr'g Tr. at 19:2-3. The petitioner then "said to [him]self" that he should instead conduct "a comprehensive study of the situation" involving the Afghani refugees, id. at 19:6, after which he would return "to Yemen and make a proposal to . . . a charity organization there," with the hope that the organization would "be willing to help [and] offer support," id. at 19:16-18. It is not clear to the Court when during his stay in Pakistan the petitioner came to realize that he could not perform volunteer work for a charitable organization due to his age, given his other testimony at the merits hearing that while in Karachi, he decided to travel to Quetta after learning about a charitable organization in that city devoted to assisting Afghani refugees, id. at 26:21-22, and that while in Quetta he spoke to individuals about how to join a charitable organization in Quetta, id. at 29:6-7.

[5] The petitioner testified he had no intention to travel to Afghanistan prior to leaving Yemen for Pakistan in September 2000. 5/26/10 Hr'g Tr. at 20: 18-20.

4

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET~~

not know his first name), who he spoke with on "many" occasions and from whom he received "advice," 5/26/10 Hr'g Tr. at 31:15. The petitioner understood Khan to be involved in the sale of electronics in Pakistan, see id. at 30:16-31:4 (explanation by the petitioner regarding Khan's sale of electronics), and that he had no affiliation with al-Qaeda or the Taliban, id. at 31:7-9. The petitioner learned that Khan "was going to Afghanistan" and asked whether he could travel with Khan, to which Khan agreed. Id. at 31:16-19; but see id. at 30:8-9 (question posed by his counsel as to whether Khan "discuss[ed] the word 'Afghanistan' with you," to which the petitioner responded "No"). Then, in approximately February 2002, the petitioner and Khan traveled to Kabul, Afghanistan, Joint Stmt. at 12, by way of a "transportation taxi,"[6] 5/26/10 Hr'g Tr. at 32:12, with transfers at the Pakistani-Afghani border and Kandahar, Afghanistan, id. at 32:7-10.

Upon his arrival in Kabul, the petitioner stayed at "a very ordinary hotel" for a few days, id. at 33:19-22, before "rent[ing] . . . a very small apartment in one of the neighborhoods" in Kabul, id. at 33:24-25. The apartment was located in a two-story building, with a small family living on the second floor. See id. at 35:2-3 (testimony by the petitioner that "an older man lived [on the second floor] with his family and children"). The petitioner stayed at this apartment for "[a]bout three months."[7] Id. at 35:9-10. According to the petitioner, Khan did not stay with the

---

[6] Based on the petitioner's description of a "transportation taxi" during his testimony, the Court assumes that this mode of transportation is more akin to a bus or shared vanpool, rather than a private taxi service that is commonly used in other parts of the world. See 5/26/10 Hr'g Tr. at 32:12-14 (testimony by the petitioner describing a "transportation taxi" as "a taxi that . . . fills up with people and then . . . takes off").

[7] Contrary to the government's position, see Joint Stmt. at 1 ("While in Afghanistan, [the p]etitioner worked at an al-Qaida[-]associated guesthouse and spent time at another."), the petitioner denies ever staying at a guesthouse in Afghanistan, 5/26/10 Hr'g Tr. at 36:12-14, let alone a guesthouse associated with al-Qaeda, id. at 35:11-14. The Court need not resolve this dispute, as other evidence in the record sufficiently demonstrates that the petitioner is detainable under the AUMF.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

petitioner in Kabul, id. at 33:12-13, and the petitioner has not heard from Khan since they arrived in the city, id. at 34:18-19.

During his three-month stay in Kabul, the petitioner testified that he initiated a study regarding the needs of Afghani refugees, id. at 37:16-19, so that he "could go back to Yemen, and[,] . . . with the help of [his] father[,] . . . go and talk to charit[ies]" about his findings. Id. at 38:9-11. As part of his study, the petitioner asserts that he wanted to obtain "bills" that would evidence how much money was needed to help the poor, id. at 20-22, and determine "the quantity of food or clothes that [an] average family would need . . . on a monthly basis," id. at 38:3-4. The study was "very important," according to the petitioner, id. at 39:4, because "if [he] returned [to Yemen] with the necessary documents [together] with . . . the stud[y]," then charities in Yemen "would be more than willing to help" him; without a study, the petitioner felt that these charities "would[ not] take [him] seriously." Id. at 38:17-19. After collecting data for his study, see id.at 39:9-14 (testimony by the petitioner that he collected information from food markets in the area), the petitioner decided to return "to Pakistan and pursue [his] study of the Koran," id. at 39:15-16. The petitioner then returned to Quetta, id. at 39:20, in "approximately April or May 2000" and stayed there for approximately three months, id. at 40:2-5, at the Jama'at al-Tablighi mosque, see Pet'r's Exhibits, Ex. 201 (Second Declaration of Abdul Ahmed Qader Hussein ("Second Pet'r's Decl.") ¶ 6 (declaration by the petitioner that on his second trip to Quetta, he stayed, "as described in [his first d]eclaration, . . . in a mosque"); but see Pet'r's Exhibits, Ex. 200 (First Pet'r's Decl.) ¶ 18 (declaration by the petitioner that in addition to his initial stay at the Jama'at al-Tablighi mosque, he also stayed there "from May to June 2000").

The petitioner made a second trip to Kabul in or around June 2000. Pet'r's Exhibits, Ex. 201 (Second Pet'r's Decl.) ¶ 5. The petitioner asserts that he continued with his study by

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

**SECRET**

examining "location[s]," 5/26/10 Hr'g Tr. at 41:6, as well as how much it would cost to hire

personnel for his charity efforts, see id. at 41:7-9 (testimony by the petitioner that he wanted to

determine "how much it was going to cost [him]" to hire a "guard," a "board," and a "janitor").

He stayed in Kabul "for a few months" before returning to Quetta "in approximately August . . .

2000," id. at 41:11-12, where he once again stayed at the Jama'at al-Tablighi mosque, Pet'r's

Exhibits, Ex. 200 (First Pet'r's Decl.) ¶ 18.

　　The petitioner then made his third and final trip to Kabul "around November . . . 2000."

5/26/10 Hr'g Tr. at 42:4-5. He claims that on this trip, he "wanted . . . to interact with the poor

people, . . . [and] to learn the[ir] language."[8] Id. at 42:8-9. The petitioner stayed at the same

location where he had resided during his first trips to Kabul, id. at 42:22, for approximately "ten

days to two weeks," id. at 42:25-43:1, before he "decided to go to an area located in the northern

part of Kabul where there were . . . a large number of Afghani refugees," id. at 43:4-6. The

petitioner asserts that he decided to visit this area because he "met three Afghani people" at a

market, id. at 43:9, one of whom he told about his study, id. at 43:11-13, who invited him to

accompany them to that location, id. at 43:23-24. The petitioner admits that the location was

"near the battle lines of the fighting between the Taliban and the Northern Alliance," Joint Stmt.

at 12; see also Pet'r's Exhibits, Ex. 200 (First Pet'r's Decl.) ¶ 22 ("In my last visit to Afghanistan

. . . , I went with these young men to an area near the battle lines of the fighting between the

Taliban and the North[ern] Alliance . . . ."), and that the three individuals "were Taliban guards,"

Joint Stmt. at 12; see also Pet'r's Exhibits, Ex. 200 (First Pet'r's Decl.) ¶ 21 ("During my stay in

Kabul, I bec[a]me friends with some young Afghanis who I understood were Taliban guards.").

---

[8] According to the petitioner, the language spoken by these individuals was Farsi, 5/26/10 Hr'g Tr. at 42:12-14, and that he did in fact learn to speak "a little bit" of the language, id. at 17-18.

**SECRET**

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

During his stay in the northern part of Kabul, the petitioner admits that one of the Taliban guards provided him with a Kalashnikov rifle. 5/26/10 Hr'g Tr. at 57:5-6. He asserts that the rifle was given to him by the Taliban guard "for [his] self-protection," id. at 57:6-7, because "lots of wild animals" resided in the area, id. at 57:7-8, and because he could be "assaulted by two or three Afghanis . . . who kn[e]w that" the petitioner was carrying money at the time, id. at 57:11-13. The guard, "in only a few minutes," also "taught [the petitioner] how to use [the rifle] and how to shoot with it." Id. at 59:11-12. According to the petitioner, this was his "only experience with weapons in Afghanistan." Id. at 60:5-7.

"By August 2001," the petitioner asserts that "the excitement and adventure of traveling in the area and providing aid to war victims had ended." Pet'r's Exhibits, Ex. 201 (Second Pet'r's Decl.) ¶ 8. According to the petitioner, "[t]he conditions in th[e northern part of Kabul] . . . were quite difficult, and the experience of being in the area of conflict and seeing all the suffering of the poor and those displaced by the war grew draining." Id. In addition, the petitioner claims that he "wanted to get married" because "at the age of 16 or 17, people [in the Middle East] will have lots of respect for you[;] they consider that . . . you have become a man, [and that] you are independent." 5/26/10 Hr'g Tr. at 75:20-22. The petitioner testified that he "was ready to return to [his] family and life in Yemen," so he "returned to Kabul in approximately late August 2001, with the goal of continuing to Pakistan to arrange [his] travel home." Id.

The petitioner returned from the northern part of Kabul in early September 2001, and he was present in that city "when the United States was attacked on September 11[th]." Joint Stmt. at 12. He was in Kabul during this stay for approximately two weeks, 5/26/10 Hr'g Tr. at 76:17-18, before traveling to Lahore, Pakistan, id. at 77:14-15; see also id. at 77:16-17 (testimony by

8

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

the petitioner that he left Kabul for Lahore approximately "two or three days following the events of September 11[th]"). While in Lahore, the petitioner stayed at the Jama'at al-Tablighi mosque located in that city. Id. at 78:15-17. The petitioner's stated intention in Lahore was to make arrangements to travel to Yemen, id. at 78:17-18; specifically, he stated that he "was planning on either going to Islamabad[, Pakistan] and purchas[ing] a return ticket to Yemen," or he would try to "fly directly from Lahore to Yemen," id. at 78:22-23. However, after "talking to . . . people in the mosque and trying . . . to get good advice on how to get from Pakistan to Yemen," id. at 79:3-4, the petitioner asserts that while there were flights from Pakistan to Yemen, they would require "several layovers in some places and the ticket would be expensive." Id. at 79:5-6. The petitioner claims that with the limited amount of money available to him, he "was looking . . . to buy [a ticket with] a maximum of one layover." Id. at 79:7-8. For these reasons, the petitioner represents that he decided not to travel to Islamabad, id. at 78:24-25.

The petitioner had a conversation with another individual at the mosque, during which they discussed the petitioner's interest in "study[ing] the Koran and . . . computer[s]," and how the petitioner "could[ not] find a school that would teach [classes on] computer[s] because . . . [his] language was Arabic and the language . . . used to teach [these classes] was Urdu." Id. at 79:20-24. The individual suggested that the petitioner live with "some Yemeni students who attended" the Salafi University in Faisalabad, Pakistan, id. at 80:2-4, because he could "just go to [the] university and . . . study the Koran there," id. at 80:7-8. Given that "there were some Yemenis that were . . . attending the university and . . . lived in their own apartment," id. at 80:11-13, the petitioner felt it was "a very good idea" to look into the possibility of studying at the university, id. at 80:18; see also id. at 80:14-15 (testimony by the petitioner that the individual offered to "talk [with] the head of the university and tell him about [the petitioner's]

9

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET~~

wish to study in that university so that [he] could live . . . with the Yemenis"). While at the mosque on another occasion, the same individual informed the petitioner that "[t]he director of the university" had authorized the petitioner to "live with the Yemenis," and that "[i]f he decide[d] to pursue [his] studies, [then] he [could] enroll . . . in the program." Id. at 80:23-24. The petitioner then left Lahore and traveled with this individual to Faisalabad, Pakistan. Id. at 80:25-81:1.

The petitioner arrived at the house where the university students lived upon his arrival in Lahore, see id. at 81:17-19, which he described as being managed by "the head of the university," id. at 82:21-22. There, the petitioner "saw some Yemeni guys that were studying at [the] university," and who spent "[m]ost of their time . . . memorizing the Koran." Id. at 81:19-21. The petitioner also described another individual, a man named Issa, as "the purchase man" for the house, who "would go buy potatoes, rice, chicken, meat . . . and leave it at the door" of the house. Id. at 15-19.

Despite his stated interest in attending the Salafi University, the petitioner did not enroll in any classes there while living at the Faisalabad house. May 27, 2010 Hearing Transcript ("5/27/10 Hr'g Tr.") at 45:9. The petitioner testified that he did not enroll because the university would "test" him on "how many parts" of the Koran he has already memorized, and thus he wanted to "stay[ at] th[e] house [and] memoriz[e] as much as [he] could before . . . go[ing] . . . to enroll." Id. at 45:13-16. Furthermore, the petitioner stated that while his "plan was . . . to memorize the Koran," he also wanted to "go back to Yemen and get married." Id. at 82:2-3. Nonetheless, the petitioner asserts that "it was important for [him] to memorize the Koran so [that he could] go back to [his] father and tell him that [he had] memorized the Koran." Id. at

10

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

82:5-7. He also testified that because he "wanted to get the degree," he ultimately decided not to travel to Islamabad. 5/27/10 Hr'g Tr. at 47:9-11.

On May 23, 2002, 5/26/10 Hr'g Tr. at 85:10-12; see also Joint Stmt. at 12, the petitioner stated that during the night "someone was knocking at the door" of the house where he was staying, id. at 85:14-15. One of the occupants of the house "opened the door[] and . . . was [confronted] by the Pakistani police." Id. at 85:15-16. The police indicated that they were there to "check on the people who [were] in th[e] house," id. at 85:18-19, and they asked everyone to show their passports, id. at 85:21. After reviewing their passports, the Pakistani police took the petitioner and the other occupants into custody. Id. at 86:4-5; see also Joint Stmt. at 38 (stipulation by the parties that the "[p]etitioner was arrested by Pakistani authorities at a house in Faisalabad, Pakistan"). That same month, the petitioner was "transferred to the custody of the United States . . . , and has remained in the custody of the United States ever since." Joint Stmt. at 12; see also 5/26/10 Hr'g Tr. at 8:11-13 (acknowledging that he was "taken into custody by the United States in March 2002").

Along with numerous other detainees, the petitioner filed the petition now before the Court on October 27, 2005, seeking his release from Guantanamo Bay on the grounds that, among other things, he is being held "in violation of the [United States] Constitution, laws[,] and treaties of the United States and customary international law." See Pet. ¶ 3. Having "serious questions concerning whether this Court retain[ed] jurisdiction" as a result of Congress's attempt to strip this Court of jurisdiction by passing the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241) (the "2006 MCA"), the Court stayed the proceedings in these cases until the question of jurisdiction was resolved on appellate review. January 31, 2007 Order at 1, Al Jayfi v. Bush, Civil Action No. 05-2104 (RBW)

11

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

(D.D.C. Jan. 31, 2007). The stay in this case was later lifted after the Supreme Court issued its opinion in Boumediene v. Bush, 553 U.S. 723 (2008), July 29, 2008 Order at 2, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.) in which the Supreme Court held that non-United States citizens detained at Guantanamo Bay are constitutionally entitled to seek habeas relief and that the 2006 MCA's jurisdiction-stripping provision was "an unconstitutional suspension of the writ." Boumediene, 553 U.S. at 792.

In light of the Boumediene decision, the members of this Court on July 1, 2008, "resolved by Executive Session to designate" the Honorable Thomas F. Hogan of this Court "to coordinate and manage proceedings in all cases involving petitioners presently detained in Guantanamo Bay, Cuba."[9] July 2, 2008 Order at 1, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.). After carefully considering the positions of the various parties in these cases, Judge Hogan issued a case management order on November 6, 2008, which outlined the procedural and substantive contours for resolving these habeas petitions.[10] Pursuant to this order, the government then filed its classified Factual Return in this case on October 31, 2008, in which it proffered the evidence it intended to rely upon in this proceeding to justify the petitioner's detention. In turn, the petitioner responded to the evidence proffered by the government in his Traverse, which he filed on May 8, 2009. With all discovery having been completed and the matter having been fully briefed, the Court commenced a hearing on May 25, 2010, to consider the merits of the petitioner's petition for a writ of habeas corpus.

---

[9] As noted in Judge Hogan's July 2, 2008 Order, "[e]xcluded from reassignment are all cases over which Judge Richard J. Leon presides as well as Hamdan v. Bush, 04-cv-1519 (Robertson, J.)." July 2, 2008 Order at 2 n.1, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.).

[10] Judge Hogan subsequently amended his case management order on December 16, 2008, and this member of the Court issued several amendments to the order on December 19, 2008, February 19, 2009, and June 12, 2009.

12

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## II. Standard of Review

The ultimate question to be resolved with regard to the petitioner's habeas petition is whether the government's detention of the petitioner is lawful under the AUMF. While the Supreme Court in Boumediene held that individuals detained by the government at Guantanamo Bay are "entitled to the privilege of habeas corpus to challenge the legality of their detention," Boumediene, 553 U.S. at 771, it also concluded that "[t]he extent of the showing required of the Government in these cases [was] a matter [left] to be determined" in future proceedings," id. at 787. The development of the detention standard in these Guantanamo Bay habeas cases was thoroughly explored by this Court in Sulayman v. Obama, 729 F. Supp. 2d 26 (D.D.C. 2010) (Walton, J.), and it need not repeat that analysis here. Suffice it to say that

> under the law of this circuit, the government may establish the lawfulness of the petitioner's detention by showing that he "engaged in hostilities . . . against the United States," that he "purposefully and materially supported hostilities against the United States or its coalition partners," or that he "is part of the Taliban, al Qaeda, or associated forces." And, the determination of whether an individual is "part of" the Taliban, al Qaeda, or associated forces is one that "must be made on a case-by-case basis by using a functional rather than a formal approach." Moreover, the government may seek to justify detention by making a showing that the detainee was part of the "command structure" of either the Taliban, al Qaeda, or their associated forces, yet it is not necessary for the government to make such a showing. But, the government must do more than just prove that the detainee was an "independent . . . freelancer."

Id. at 33 (internal citations omitted).

As for the burden of proof required to justify detention, the Court noted in Sulayman that the standard set forth in Judge Hogan's case management order—"to wit, that the government has the burden of persuading the Court that the petitioner is detainable under the AUMF by a

13

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

preponderance of the evidence"—has been accepted by the District of Columbia Circuit.[11] Id.; see also Awad v. Obama, 608 F.3d 1, 10 (D.C. Cir. 2010) (citing Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010)) ("We have already explicitly held that a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay."). This means that the government must convince the Court "to believe that the existence of a fact is more probable than its nonexistence." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (internal quotation marks omitted). Accordingly, the government has the initial burden of producing evidence in support of its claim for detention, and should the government produce evidence sufficient to establish a prima facie case for detention, then the burden of producing evidence to rebut the government's case shifts to the petitioner. See Hamdi v. Rumsfeld, 542 U.S. 507, 534 (2004) (observing that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria," and that such a "burden-shifting scheme" would not offend the Constitution). After both parties have presented all of their evidence, the Court must weigh the evidence to determine whether the government has met its burden of showing that its evidence "is . . . more convincing than the evidence . . . offered in opposition to it." Greenwich Collieries v. Dir., Office of Workers' Comp. Programs, 990 F.2d 730, 736 (3d Cir. 1993). If the government is successful in making this showing, then the Court

---

[11] As the Court observed in Sulayman, the District of Columbia Circuit has "left open the question of whether a lower standard of proof could constitutionally suffice as well." 729 F. Supp. 2d at 26 n.5 (citing Al-Bihani, 590 F.3d at 878 n.4.); see also Al-Adahi v. Obama, 613 F.3d 1102, 1103-04 (D.C. Cir. 2010) (noting that it was not "aware of [any] precedents in the eighteenth[-]century English courts [that] adopted a preponderance standard," and that the standard of proof applied in various habeas proceedings ranged from "some evidence to support the order" to "probable cause"). However, given that the government in this case has established the lawfulness of the petitioner's detention by a preponderance of the evidence, the Court need not resolve the standard-of-proof question left open by the Circuit.

14

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

must deny the habeas petition. But, where the petitioner's evidence demonstrates that his version of the facts is more likely to be true, or where "the evidence is evenly balanced," the Court must rule in favor of the petitioner. Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 281 (1994).

In weighing the evidence in this case, the Court is mindful of its obligation not to view each piece of evidence in isolation. Awad v. Obama, 608 F.3d 1, 7 (D.C. Cir. 2010). Thus, "[m]erely because a particular piece of evidence is insufficient, standing alone, to prove a particular point does not mean that the evidence may be tossed aside and the next piece of evidence may be evaluated as if the first did not exist." Salahi v. Obama, 625 F.3d 745, 753 (D.C. Cir. 2010). The Court, therefore, must view the government's evidence "in its entirety in determining whether [it] has satisfied its burden of proof." Id.

### III.  Legal Analysis

As noted above, the Court is tasked with determining whether the government has met its burden of proving by a preponderance of the evidence that the petitioner was a "part of" al-Qaeda or the Taliban at the time of his apprehension. To that end, the District of Columbia Circuit's decision in Almerfedi v. Obama, ___ F.3d ___, ___, 2011 WL 2277607 (D.C. Cir. 2011), controls the disposition of this case. There, the Circuit confronted the question of whether the district court "fail[ed] to give sufficient weight to the reliable evidence it . . . consider[ed]" in that case, thereby erring in its "conclu[sion] that the government failed to demonstrate by a preponderance of the evidence that [the detainee] was . . . 'part of' al Qaeda." Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *1. The Circuit started its analysis by examining the significance of the detainee's association with the Jamaat al-Tablighi, "an Islamic missionary organization that is a Terrorist Support Entity 'closely aligned' with al Qaeda." Id. at ___, 2011

15

SECRET

SECRET

WL 2277607, at *4. Specifically, the detainee in that case acknowledged staying "for two[-]and[-]a[-]half months at Jama'at [al-]Tablighi" headquarters for free, but that "he refused to join the organization and remained largely incommunicado." Id. The Circuit considered this evidence, in conjunction with two additional pieces of circumstantial evidence, as "damning." Id. at 5. Those other two items of circumstantial evidence were the detainee's travel route, which the Circuit found was "quite at odds with his professed desire to travel to Europe (and brought him closer to the Afghan border where al Qaeda was fighting), and also [the detainee's possession of] at least $2,000 of unexplained cash on his person when captured," id. at 4.

The Circuit concluded that Almerfedi's extended cost-free stay at the Jamaat al-Tablighi mosque was "probative, [although] by itself it presumably would not be sufficient to carry the government's burden because there are surely some persons associated with Jama'at [al-]Tablighi who are not affiliated with al-Qaeda." Id. The Circuit found, however, that the government's case was on "firmer ground" when the evidence concerning Jamaat al-Tablighi was "add[ed]" together with the government's other two items of circumstantial evidence, id. at __, 2011 WL 2277607, at *4, which the Court found "distinguish[ed]" Almerfedi "from the errant tourist, embedded journalist, or local aid worker," id. at __, 2011 2277607, at *5. The Circuit "conclude[d] that all three facts, when considered together, [were] adequate to carry the government's burden of deploying credible evidence that the habeas petitioner meets the enemy-combatant criteria." Id. (internal citation omitted). Accordingly, the Circuit "conclude[d] as a matter of law that the district court erred" in the manner in which it applied the preponderance standard, and it reversed the district court's decision to grant the petitioner's petition for a writ of habeas corpus. Id. at __, 2011 WL 2277607, at *6 (emphasis added).

16

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Here, the government has also presented sufficient evidence to justify the petitioner's detention.[12] First, the petitioner's extended stays at two Jama'at al-Tablighi mosques during his visits to Pakistan constitute probative evidence weighing in favor of his detention. See Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *4 (finding a single two-and-a-half-month stay at a Jama'at al-Tablighi mosque to be probative). Second, the petitioner's receipt of a Kalashnikov rifle from three Taliban guards in an area near the lines of battle between the Taliban and Northern Alliance, as well as the training he received from one of the Taliban guards regarding how to use the weapon, constitutes probative, if not conclusive, evidence supporting the petitioner's detention. See Sulayman, 729 F. Supp. 2d at 50 (Walton, J.) (concluding that a detainee's "presence at a 'staging area'" near the zone of battle "is by itself highly probative evidence of the [detainee's] status as 'part of' the Taliban"); id. at 51 (ascribing additional weight to a detainee's presence at the battle lines where "he took possession of a powerful weapon during . . . his visits to the 'staging area'"); Cf. Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *4 n.7 (observing in dicta that "the government could satisfy its burden [of proof] by

---

[12] The government also relies on numerous summary interrogation reports and intelligence information reports in its case-in-chief. These interrogation reports contain unsworn hearsay statements "that [are] not otherwise admissible under the Federal Rules of Evidence or 28 U.S.C. § 2246 [(2006)]," and thus the government has the burden of "establish[ing] the reliability of those statements" under the two-prong standard set forth by Judge Hogan in his case management order, and as supplemented by the decisions issued by this Court and thoroughly discussed in Sulayman. ___ F. Supp. 2d at ___, 2010 WL 3069568, at *11. But the Court need not assess whether the government has presented its hearsay "in a form . . . that permits the . . . [C]ourt to assess its reliability," Parhat v. Gates, 532 F.3d 834, 849 (D.C. Cir. 2008), because as the Court discusses below, the government's case for detention can be made based on the stipulated facts, the petitioner's sworn declarations, and his testimony.

As for any hearsay evidence that the petitioner relies upon in support of his case-in-chief, this member of the Court observed in Sulayman that there remains an open question as to whether the prohibitions against the admission of hearsay evidence should be relaxed for the petitioner's proffered hearsay evidence, given that "the Supreme Court mentioned only the possibility of considering hearsay proffered by the government in Hamdi and Boumediene." Sulayman, ___ F. Supp. 2d at ___, 2010 WL 3069568, at *11 n.10 (citations omitted and emphasis added). But here, the petitioner does not rely on any hearsay evidence to rebut any of his inculpatory statements set forth in the stipulated facts, his declarations, or his testimony, and thus there is no need for the Court to address this unresolved hearsay question.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

showing that an individual was captured carrying a[ Kalashnikov rifle] on a route typically used by al Qaeda fighters"). Third, the petitioner's actions after the September 11, 2001 terrorist attacks were "quite at odds" with his stated innocent intentions, cf. Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *4 (concluding a detainee's travel route that was "quite at odds with his professed desire to travel to Europe to be "damning" circumstantial evidence"); specifically, (1) the petitioner testified that he intended to leave Kabul and travel to Pakistan so that he could reunite with his family in Yemen and possibly get married, id. at 78:17-18, yet he made no credible effort to leave Pakistan; and (2) the petitioner testified that he did not enroll at the Salafi University, even though he traveled to Faisalabad, Pakistan because of his interest to attend the university, see id. at 80:11-15. These facts, when viewed together, are more than sufficient to constitute the level of "damning" circumstantial evidence that is needed to satisfy the government's burden of proof in this case.

The petitioner's attempt to place an innocuous gloss on these incriminating facts is unavailing; in fact, his explanations are nothing more than "false exculpatory statements" that constitute "evidence—often strong evidence—of guilt." See Al-Adahi v. Obama, 613 F.3d 1102, 1107 (D.C. Cir. 2010). With regard to his interactions with the Taliban guards, the Court is simply not persuaded by the petitioner's explanation that these guards were merely his "friends," see Pet'r's Exhibits, Ex. 200 (First Pet'r's Decl.) ¶ 21, and that he was only given the weapon to protect himself from wild animals and potential thieves, 5/26/10 Hr'g Tr. at 57:6-13. As the Court explained in Sulayman, the fact that the petitioner received a powerful weapon from a Taliban guard in an area near the battle lines "suggest[s] that the [guard] trusted the petitioner enough to allow him to take possession of [his] firearm[]. More importantly, these facts suggest that th[is] individual[] trusted the petitioner because he was loyal to their cause."

18

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

Sulayman, 729 F. Supp. 2d at 51.  In fact, the petitioner's explanation that he was given the weapon to fend off wild animals and potential thieves is inexplicable because "it would be beyond any sense of reason . . . that [a] Taliban [guard] would allow a noncombatant to be present in" an area near the battle lines with a deadly weapon. Id. at 51-52.  Thus, the Court finds the petitioner's explanations to be without merit.

The nonsensical explanations provided by the petitioner concerning why he stayed in Pakistan after the events of September 11, 2001, likewise cannot be believed.  The petitioner testified at the merits hearing that he sought to leave Afghanistan and return to Yemen because he wanted to get married and return to his family, and that while he was in Lahore he intended to make arrangements to travel to Yemen, id. at 78:17-18.  Yet, when the petitioner arrived in Lahore and had the opportunity to fly back to Yemen, id. at 78:22-23, he decided not to do so because he purportedly had "limited" amounts of money and was looking to buy a ticket with a "maximum of one layover," but the only flights available from Lahore to Yemen would require "several layovers in some places and the ticket would be expensive," id. at 79:5-8.  The petitioner cannot expect the Court to accept this explanation.  First, there is no corroborating evidence in the record showing that flights from Lahore to Yemen with "several layovers" were more expensive than flights with less layovers; in the absence of such evidence, this premise strikes the Court as implausible given that the more layovers a traveler must experience to reach his or her final destination generally results in a less expensive ticket for the traveler.  Thus, it makes little sense to the Court that the petitioner was dissuaded from traveling home because he could not find a cheaper ticket with fewer layovers.  Furthermore, the Court is not convinced that the petitioner would forego reuniting with his family merely because of the inconvenience of having to make several stops to travel from Lahore to Yemen; it is simply implausible that the

19

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## ~~SECRET~~

unavailability of a convenient flight served as an insurmountable barrier to the petitioner in his efforts to return home. This explanation for why he remained in Lahore renders his reasons unworthy of belief.

The petitioner's actions after deciding not to fly back to Yemen from Lahore are even more inexplicable. The petitioner acknowledged at the merits hearing that flights were also available out of Islamabad, Pakistan, 5/26/10 Hr'g Tr. at 78:22-23, but the petitioner made no effort to travel north to Islamabad to find a flight to return to Yemen; instead, he traveled west to Faisalabad. He then claims that he traveled to Faisalabad because he wanted to enroll in the Salafi University, id. at 80:2-4, "and . . . study the Koran there," id. at 80:7-8. That statement, too, is not worthy of credit. Despite the petitioner's claims that he wanted to study the Koran, and that this new aspiration supplanted his desire to return to Yemen to reunite with his family and possibly get married, the petitioner admits that he never enrolled as a student at the university upon his arrival in Faisalabad. 5/27/10 Hr'g Tr. at 45:9. The petitioner then attempts to explain why he delayed his effort to enroll in the university by stating that he wanted to "stay[ at] th[e] house [and] memoriz[e the Koran] as much as [he] could before" being tested by the university on his knowledge of the Koran. Id. at 45:13-16. But, this explanation makes little sense as well, since his stated purpose for attending the university was to learn the Koran. In fact, all of the petitioner's explanations seem to be little more than post hac attempts to present goals that change as necessary to support his presence in one part of the world or another. The sum of the petitioner's inexplicable explanations for his actions renders his testimony completely incredible.

In sum, the Court concludes that the government has provided more than enough evidence to meet its burden of proof in this case. Not only has the government satisfied its initial

20

## ~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET

burden of producing evidence that supports its detention of the petitioner, see Hamdi, 542 U.S. at 534, by proffering "damning" circumstantial evidence, see Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *5, but the petitioner's nonsensical version concerning his travel from Kabul to Lahore after the events of September 11, 2001, provides further justification for his detention, see Al Adahi, 613 F.3d at 1107. Accordingly, the Court is compelled to conclude that the weight of the evidence in this case supports the petitioner's detention under the AUMF.

### IV.   Conclusion

"Once the government has established by a preponderance of the evidence that [the petitioner] was 'part of' al Qaeda and Taliban forces, the requirements of the AUMF are satisfied and the government has the authority to detain [the petitioner]." Id. at ___, 2010 WL 2679752, at *9. The "damning" circumstantial evidence in this case—all of it derived from the petitioner's own admissions—are "sufficient to distinguish [the] petitioner from the errant tourist, embedded journalist, or local aid worker," Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *4, and thus the government has satisfied its burden of establishing the lawfulness of the petitioner's detention. Because the petitioner has failed to put forth persuasive evidence in rebuttal, the Court must deny the petitioner's petition for a writ of habeas corpus.

**SO ORDERED** this 12th day of October, 2011.[13]

REGGIE B. WALTON
United States District Judge

---

[13] An Order will accompany this Memorandum Opinion denying the petitioner's petition for a writ of habeas corpus.

21

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABDUL QADER AHMED HUSSEIN, | ) | Filed with Classified Information Security Officer |
|  | ) | CISO _____ |
| Petitioner, | ) | Date _____ |
|  | ) |  |
| v. | ) | Civil Action No. 05-2104 (RBW) |
|  | ) |  |
| BARACK H. OBAMA, | ) |  |
| President of the United States, et al., | ) |  |
|  | ) |  |
| Respondents. | ) |  |

### ORDER

In accordance with the Memorandum Opinion entered this same date, it is hereby

**ORDERED** that the petitioner's petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED** this 12th day of October, 2011.

REGGIE B. WALTON
United States District Judge

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE